1
2
3
4
5
6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7

8   GREGORY MANEMAN, ANNETTE WILLIAMS,
    CASSANDRA WRIGHT, JAMES HOLLINS, AND
9   PIERRE DONABY, individually and as
    representatives on behalf of a class of similarly
10  situated persons,

11                      *Plaintiffs*,

12  v.

13  WEYERHAEUSER COMPANY,
    WEYERHAEUSER COMPANY ANNUITY
14  COMMITTEE, WEYERHAEUSER COMPANY
    ADMINISTRATIVE COMMITTEE, STATE
15  STREET GLOBAL ADVISORS TRUST
    COMPANY, AND JOHN DOES 1–5,
16
                        *Defendants*.
17

Civil Action No. 2:24-cv-2050

**COMPLAINT—CLASS ACTION**

JURY TRIAL DEMANDED

18          1.      Plaintiffs Gregory Maneman, Annette Williams, Cassandra Wright, James Hollins,

19  and Pierre Donaby, individually and as representatives of a class of similarly situated persons

20  whose benefit payments were transferred from the Weyerhaeuser Pension Plan (the "Plan"), bring

21  this action against Defendants the Weyerhaeuser Company ("Weyerhaeuser"), the Weyerhaeuser

22  Company Annuity Committee ("the Annuity Committee"), the Weyerhaeuser Company

23  Administrative Committee (the "Administrative Committee") (collectively the "Weyerhaeuser

24  Defendants"), State Street Global Advisors Trust Company ("State Street"), and John Does 1–5

COMPLAINT                                    1                      Schlichter Bogard LLP
                                                                   100 S. 4th Street, Ste. 1200
                                                                   St. Louis, MO 63102

1  (collectively, "Defendants"), for breach of fiduciary duty and other violations of the Employee

2  Retirement Income Security Act of 1974 ("ERISA"), Pub. L. No. 93-406, 88 Stat. 829, as amended,

3  29 U.S.C. §§ 1001 *et seq.*

4       2.    Congress enacted ERISA and designed the statute to impose strict fiduciary duties

5  and other conduct-regulating obligations upon plan sponsors, administrators, and others, such as

6  to regulate their ability to transfer workers' benefits from the federally regulated pension system

7  to private annuity providers. Plan fiduciaries must act "'with the care, skill, prudence, and

8  diligence' that a prudent person 'acting in a like capacity and familiar with such matters' would

9  use," *Tibble v. Edison Int'l*, 575 U.S. 523, 528 (2015) (quoting 29 U.S.C. § 1104(a)(1)(B)), and an

10  ERISA fiduciary's duties to participants and their beneficiaries "are the highest known to the law,"

11  *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996) (quoting *Donovan v. Bierwirth,* 680 F.2d

12  263, 272 n.8 (2d Cir. 1982)). Fiduciaries must act with both prudence and loyalty, and "solely in

13  the interest of the" employees who participate in the plan. 29 U.S.C. § 1104(a)(1). That is,

14  fiduciaries must make plan-related decisions with "an eye single to the interests of the participants

15  and beneficiaries," instead of favoring their own interests or those of a third party. *Bierwirth*, 680

16  F.2d at 271 (citing RESTATEMENT (SECOND) OF TRUSTS § 170 (1959); Austin Wakeman Scott, *II*

17  *Scott on Trusts* §170, at 1297–99 (3d ed. 1967); George G. Bogert, *The Law of Trusts and Trustees*

18  § 543 (2d ed. 1978)).

19       3.    In exchange for providing years of service to Weyerhaeuser and its affiliates,

20  Weyerhaeuser employees were eligible to participate in a Weyerhaeuser-sponsored defined benefit

21  pension plan that promised them a guaranteed monthly benefit payment during retirement. On

22  January 18, 2019, the Weyerhaeuser Defendants entered into an agreement to transfer $1.5 billion

23  of Weyerhaeuser's pension obligations to either Athene Annuity and Life Co. or Athene Annuity

24  & Life Assurance Company of New York (collectively, "Athene"), a highly risky private equity-

controlled insurance company with a complex and opaque structure. This transaction affected approximately 28,500 U.S.-based retirees and their beneficiaries, including Plaintiffs, who depended on Weyerhaeuser's promise to guarantee their pension benefits throughout retirement under an ERISA-governed Plan. This transfer affected more than 52% of participants who participated in the Plan.

4.      As a result of this transaction, Plaintiffs and similarly situated Weyerhaeuser retirees and their beneficiaries are no longer covered by the Plan and, therefore, no longer receive ERISA's protections for employee retirement benefits. Although an employer's decision to transfer pension obligations to an insurance company is considered a business decision not subject to fiduciary standards, the choice of an insurer is a fiduciary decision subject to ERISA's strict standards of prudence and loyalty. To fulfill those standards, the fiduciary must take steps geared toward obtaining the "safest annuity available," thereby ensuring that the pensions remain secure. 29 CFR § 2509.95-1. In other words, the fiduciary must take steps to hire the provider that "best promotes participants' and beneficiaries' interests" in retirement security. *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 302 (5th Cir. 2000). Hiring a materially riskier provider to save the employer money is an egregious violation of fiduciary standards. *Id.*

5.      Defendants did not select the safest annuity available or an annuity that would otherwise best promote the retirees' interests in ensuring the long-term security of their pension benefits. Instead, Defendants selected Athene, which is substantially riskier than numerous traditional annuity providers. Annuities issued by Athene are structured to generate higher expected returns and profits for Athene and its affiliates by investing in lower-quality, higher-risk assets without the traditional mix of quality assets to support future benefit obligations. Retirees do not share in the potential upside of these high-risk strategies but bear the downside risk that losses will impair Athene's ability to pay their Weyerhaeuser pensions. Thus, Athene's high-risk

practices create substantial risk at a great cost to retirees. Because the market devalues annuities when accounting for such risk, it is likely that Weyerhaeuser saved a substantial amount of money from selecting Athene instead of an annuity from a traditional life insurer. In transferring Plaintiffs' pension benefits to Athene, Defendants put the future retirement benefits owed to Weyerhaeuser retirees and their beneficiaries at substantial risk of default. Plaintiffs were not compensated for this risk, and it devalued their pensions.

6.     To remedy these fiduciary breaches, Plaintiffs, individually and as representatives of a class of similarly situated persons whose benefit payments were transferred from the Plan, bring this action to obtain appropriate relief for Defendants' ERISA violations, including, without limitation, disgorgement of the sums involved in the improper transactions, the posting of security to assure receipt by Plaintiffs and class members of their full retirement benefits, and the monetary value of the reduced market value of Athene's annuities relative to the value of an ERISA-compliant annuity, plus prejudgment interest. *See* 29 U.S.C. §§ 1109(a), 1132(a)(2), 1132(a)(3), 1132(a)(9).

## JURISDICTION AND VENUE

7.     **Subject-matter jurisdiction.** This Court has jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action brought under 29 U.S.C. §§ 1132(a)(2), (a)(3), and (a)(9).

8.     **Standing.** Plaintiffs have standing to bring this action. Each Plaintiff has suffered injuries traceable to Defendants' conduct. They have been harmed in having their accrued pension benefits and future retirement payments removed from an ERISA-governed pension plan, backed by an established, multi-billion-dollar corporation, and then placed in the hands of a private-equity controlled insurance company with a highly complex offshore structure and risky asset portfolio. As a result of Defendants' misconduct in selecting Athene instead of the annuity that would best

Schlichter Bogard LLP
100 S. 4th Street, Ste. 1200
St. Louis, MO 63102

promote the transferees' interests, Plaintiffs lost the opportunity to obtain an annuity product of adequate quality and were forced to accept an inferior product. Plaintiffs remain subject to an increased and substantial risk that they will cease to receive the benefit payments to which they are entitled. Moreover, any rational investor would demand a greater reward for undertaking such a risk, a demand that Plaintiffs could not make. Because Plaintiffs have involuntarily had their retirement benefits exposed to a much higher uncompensated risk, Plaintiffs' retirement benefits are less valuable than they were before they were expelled from the Plan. In addition, Plaintiffs have standing to compel Defendants to disgorge any assets derived from their illegal conduct. These injuries may be redressed by this Court. *See* 29 U.S.C. §§ 1109(a), 1132(a)(3), 1132(a)(9).

9.    **Venue.** This District is the proper venue for this action under 28 U.S.C. § 1391(b) and 29 U.S.C. § 1132(e)(2) because at least one of the alleged acts or omissions giving rise to liability occurred or failed to occur within this District, and at least one Defendant resides, may be found, or regularly transacts business in this District.

## THE PLAN

10.    The Weyerhaeuser Company Retirement Plan for Salaried Employees and the Weyerhaeuser Company Retirement Plan for Hourly Rated Employees merged effective December 31, 2010, to become the Weyerhaeuser Pension Plan (the "Plan").

11.    The Plan is a defined benefit, employee benefit pension plan pursuant to 29 U.S.C. § 1002(2)(A), (35) covering certain eligible employees of Weyerhaeuser and participating affiliated companies.

12.    As of December 31, 2018, before the unlawful transaction at issue, the Plan covered approximately 54,659 total participants and beneficiaries and held approximately $4.1 billion in assets.

Schlichter Bogard LLP
100 S. 4th Street, Ste. 1200
St. Louis, MO 63102

**PARTIES**

**I.    Plaintiffs**

13.    Gregory Maneman resides in Shelton, Washington. Mr. Maneman was employed by Weyerhaeuser from November 1999, until November 2015, at which time he was a participant in the Plan under 29 U.S.C. § 1002(7). Mr. Maneman retired from Weyerhaeuser as a Senior Rover. Mr. Maneman began receiving pension payments from Weyerhaeuser by 2014. Mr. Maneman began receiving annuity payments from Athene in or around May 2019.

14.    Annette Williams resides in Tuscaloosa, Alabama. Ms. Williams was employed by Weyerhaeuser from 1987 to 2005, at which time she was a participant in the Plan under 29 U.S.C. § 1002(7). Ms. Williams retired from Weyerhaeuser as an operator. Ms. Williams began receiving annuity payments from Athene in or around May 2019.

15.    Cassandra Wright resides in Columbus, Mississippi. Ms. Wright was employed by Weyerhaeuser from 1983 to 2010, at which time she was a participant in the Plan under 29 U.S.C. § 1002(7). Ms. Wright retired from Weyerhaeuser as a shift manager in the lightweight coated department. Ms. Wright began receiving pension payments from Weyerhaeuser in approximately 2016. Ms. Wright began receiving annuity payments from Athene in or around May 2019.

16.    James Hollins resides in Dekalb, Mississippi. Mr. Hollins was employed by Weyerhaeuser from 1988 to 2006, at which time he was a participant in the Plan under 29 U.S.C. § 1002(7). Mr. Hollins retired from Weyerhaeuser as a technician. Mr. Hollins began receiving pension payments from Weyerhaeuser in approximately 2010. Mr. Hollins began receiving annuity payments from Athene in or around May 2019.

17.    Pierre Donaby resides in Macon, Mississippi. Mr. Donaby was employed by Weyerhaeuser from 1982 to 2009, at which time he was a participant in the Plan under 29 U.S.C. § 1002(7). Mr. Donaby retired from Weyerhaeuser as an operator. Mr. Donaby began receiving

COMPLAINT                                6                    Schlichter Bogard LLP
                                                            100 S. 4th Street, Ste. 1200
                                                            St. Louis, MO 63102

pension payments from Weyerhaeuser in 2009. Mr. Donaby began receiving annuity payments from Athene in or around May 2019.

**II.    Defendants**

18.    The Weyerhaeuser Company (NYSE: WY) ("Weyerhaeuser") is a publicly traded, multinational Washington profit corporation and is one of the largest private owners of timberlands in the world, owning or controlling some 10.5 million acres of timberlands in the United States, managing some additional 14.1 million acres of timberlands under long-term licenses in Canada, and operating 35 manufacturing facilities in the United States and Canada. Weyerhaeuser maintains its headquarters and principal place of business in Seattle, Washington.

19.    In 2023, Weyerhaeuser employed 9,318 employees, including 7,944 in the United States. On September 30, 2024, Weyerhaeuser reported approximately $1.68 billion in total net sales for September 30, 2024, and $5.42 billion in year-to-date total net sales. Weyerhaeuser's market capitalization exceeds $22 billion.

20.    Weyerhaeuser is the Plan sponsor under 29 U.S.C. § 1002(16)(B). The Plan's Forms 5500 also designated Weyerhaeuser as the Plan administrator under 29 U.S.C. § 1002(16)(A). Weyerhaeuser entered into a commitment agreement on January 23, 2019, with Athene under which the Weyerhaeuser Defendants agreed to purchase group annuity contracts ("GACs") that would transfer certain of Weyerhaeuser's defined benefit pension obligations to Athene. As alleged herein, Weyerhaeuser exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, or had discretionary authority or discretionary responsibility in the administration of the Plan and is a fiduciary under 29 U.S.C. § 1002(21)(A)(i) and (iii).

21.    The Weyerhaeuser Company Annuity Committee (the "Annuity Committee") was the named fiduciary with authority to appoint an independent fiduciary to select the annuity

Schlichter Bogard LLP
100 S. 4th Street, Ste. 1200
St. Louis, MO 63102

provider in connection with the transaction at issue with Athene. Accordingly, as alleged herein, the Annuity Committee exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, or had discretionary authority or discretionary responsibility in the administration of the Plan and was a fiduciary under 29 U.S.C. § 1002(21)(A)(i) and (iii).

22.    The Weyerhaeuser Company Administrative Committee (the "Administrative Committee") is the Plan administrator under 29 U.S.C. § 1002(16)(A) with the authority to control and manage the operations and administration of the Plan. Accordingly, as alleged herein, the Administrative Committee exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, or had discretionary authority or discretionary responsibility in the administration of the Plan and is a fiduciary under 29 U.S.C. § 1002(21)(A)(i) and (iii).

23.    State Street Global Advisors Trust Co. ("State Street") is a trust company headquartered in Boston, Massachusetts. State Street is a wholly owned subsidiary of State Street Bank and Trust Company. As a wholly owned subsidiary, it was formed to facilitate State Street Bank and Trust Company's asset management business and State Street Global Advisors' U.S. institutional investment management business. In connection with the transaction at issue, the Weyerhaeuser Defendants hired State Street to serve as an independent fiduciary to the Plan, which required, among other things, for State Street to select an annuity provider in compliance with 29 C.F.R. § 2509.95-1. As alleged herein, State Street exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, or had discretionary authority or discretionary responsibility in the administration of the Plan and is a fiduciary under 29 U.S.C. § 1002(21)(A)(i) and (iii). At all relevant times, State Street's website represented to the public that its services

include "[i]nsurance provider selection for annuitizing defined benefit plans (in accordance with the Department of Labor's Interpretive Bulletin 95-1)[.]"

24.     John Does 1–5 are unknown members of the Annuity Committee, members of the Administrative Committee, or others who engaged in conduct triggering "fiduciary" status with respect to the Plan or transaction at issue under 29 U.S.C. § 1002(21)(A).

**ERISA'S FIDUCIARY STANDARDS WHEN SELECTING ANNUITY PROVIDERS**

25.     ERISA's primary purpose, evidenced expressly by the plain meaning of its textual provisions, is to protect the retirement security of American workers and their beneficiaries, achieving its remedial purposes by, among other things, imposing on plan fiduciaries strict standards of conduct derived from the common law of trusts, most notably, the fiduciary duties of loyalty and prudence. 29 U.S.C. § 1104(a)(1). The statute provides, in pertinent part and with emphases added, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
> (A) for the exclusive purpose of:
>
> > (i) providing benefits to participants and their beneficiaries; and
> >
> > (ii) defraying reasonable expenses of administering the plan; [and]
>
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

26.     The Department of Labor has issued regulatory guidance, known as Interpretive Bulletin 95-1, setting forth its view of the legal standard imposed by § 1104(a)(1)(A) and (B) as it relates to a fiduciary's selection of an annuity provider in connection with a transfer of pension obligations to an insurer. 29 CFR § 2509.95-1. To fulfill the duties to act solely in the interest of participants and for the exclusive purpose of providing benefits, fiduciaries generally must take

steps calculated to obtain "the safest annuity available," among other requirements. *Id.* Fulfilling

the duty of prudence requires an objective, thorough, and analytical search for an annuity provider.

*Id.* Precedential authority adopts a materially similar standard requiring a thorough investigation

designed to obtain the annuity that "best promotes participants' and beneficiaries' interests" in

retirement security, *Bussian*, 223 F.3d at 302, which in practice will invariably be the safest

annuity.

27.     The general fiduciary duties imposed by 29 U.S.C. § 1104 are supplemented by a

detailed list of transactions that are expressly prohibited by 29 U.S.C. § 1106 and are considered

*per se* violations because they entail a high potential for abuse, including self-dealing transactions

and transactions with "parties in interest," defined to include "those entities that a fiduciary might

be inclined to favor at the expense of the plan beneficiaries." *Harris Tr. & Sav. Bank v. Salomon*

*Smith Barney Inc.*, 530 U.S. 238, 242 (2000) (citing 29 U.S.C. §§ 1002(14)); *see also* 29 U.S.C.

§ 1106(a)–(b).

## FACTS APPLICABLE TO ALL COUNTS

### I.   Pension Risk Transfers ("PRT")

28.     "Defined contribution plans dominate the retirement plan scene today." *LaRue v.*

*DeWolff, Boberg & Assocs.*, 552 U.S. 248, 255 (2008). Before defined contribution plans became

the norm, defined benefit plans (or pension plans) dominated the retirement landscape. They were

the nation's predominant retirement system when ERISA was enacted in 1974.

29.     Pension plans provide employees and retirees with a fixed, guaranteed lifetime

benefit, typically in the form of a monthly income payment after retirement. Employers are

generally responsible for funding the pension plan to pay their benefit obligations to retirees. A

formula that accounts for salary and years of service, among other factors, determines the amount

of retirement benefits provided to employees.

COMPLAINT                                    10                          Schlichter Bogard LLP
                                                                        100 S. 4th Street, Ste. 1200
                                                                        St. Louis, MO 63102

30.     A fundamental difference between traditional pension plans and defined contribution plans is which party bears the risk of underperformance. In a defined-benefit pension plan, the employer (or plan sponsor) bears that risk. In a defined contribution plan, by contrast, the employee's benefit is limited to the value of an individual investment account, meaning the employee bears the risk of underperformance. The employer must also make additional contributions to a defined benefit plan in accordance with ERISA's funding requirements, which demand additional plan contributions in certain circumstances including, among other things, if investment returns fall short of expectations and are insufficient to satisfy obligations to plan participants.

31.     In recent years, employers have increasingly sought to reduce their pension funding risk through pension risk transfer or "PRT" transactions. In such a transaction, an employer offloads all or part of its pension benefit obligations by purchasing group annuity contracts with plan assets from an insurer, who then assumes the responsibility of future benefit payments to employees and retirees covered by the transaction.

32.     A plan sponsor's selection of an annuity provider to whom it transfers its pension obligations is a critically important fiduciary function because the selected provider becomes responsible for paying retirees and their beneficiaries for the rest of their lives.

33.     PRT transactions can take one of three forms: (1) total buyouts, in which the plan is terminated and all benefit obligations are transferred to an insurer through the purchase of an annuity contract; (2) partial buyouts, in which plan sponsors purchase an annuity from an insurance company to satisfy benefit payments to a select group of participants; or (3) buy-ins, in which the plan continues to issue payments to beneficiaries but from a monthly annuity amount paid to the plan by an insurer. As discussed below, the PRT transaction at issue involved a partial buyout.

COMPLAINT                                    11                          Schlichter Bogard LLP
                                                                        100 S. 4th Street, Ste. 1200
                                                                        St. Louis, MO 63102

## II.    The Risks Associated with PRT Transactions

### A.    Lack of ERISA and PBGC Protections

34.    Participants lose protections under ERISA when their employer transfers its pension obligations to an annuity provider. With few exceptions, ERISA-governed defined benefit plans are covered by the Pension Benefit Guaranty Corporation ("PBGC"). When a PRT transaction occurs, affected pensioners lose both their ERISA and their PBGC protections and are instead only protected by state guaranty associations ("SGAs").

35.    SGAs are not pre-funded like the PBGC and thus offer substantially less protection compared to the PBGC. SGAs are funded by after-the-fact assessments of member insurers in the case of another insurer's declaring insolvency. SGAs also only provide coverage up to state law limits rather than one standard limit as defined by the PBGC. In most states, this limit is set to $250,000 "in present value of annuity benefits," which a pensioner could exhaust in mere years if their annuity provider becomes insolvent. In certain states (including California), such an annuitant automatically loses 20%, as some SGAs guarantee a maximum of 80% of the present value of the annuity, up to $250,000.

### B.    Risk of Insolvency and Executive Life

36.    The risk of insurance company failure is not merely hypothetical. The 1991 collapse of Executive Life Insurance Company ("Executive Life") provides a stark look into the potentially catastrophic consequences of high-risk insurance practices. Like the alleged conduct involving Athene, Executive Life was able to secure billions of dollars in assets and hundreds of thousands of policyholders by seizing on a competitive advantage: declaring interest rates on single-premium, deferred annuities that far exceeded industry averages.

37.    As of 1982, Executive Life was one of the Nation's largest insurers and, by 1991, it had attracted over 300,000 policyholders with its A+ credit rating for financial soundness. But

12                    Schlichter Bogard LLP
100 S. 4th St., Ste. 1200
St. Louis, MO 63102

1    in 1990, a market downturn caused losses in Executive Life's bond portfolio and led to the insurer's

2    1991 seizure by the California insurance commissioner. Following the seizure, the California

3    Insurance Commissioner sold Executive Life's portfolio to Leon Black, co-founder of Apollo

4    Global Management ("Apollo"), for approximately half its value. Apollo is the parent company of

5    Athene. Losses to policyholders as a direct result of the Executive Life takeover were extreme,

6    with policyholder damages estimated at $3.9 billion in 1991 (equivalent to approximately $9.1

7    billion in 2024).

8        38.    Leon Black was the co-head of brokerage firm Drexel Burnham Lambert

9    ("Drexel"). First Executive Corporation (the parent company of Executive Life of California and

10   Executive Life of New York) was Drexel's largest buyer of junk bonds. Unlike most insurance

11   companies that invested in safer assets, such as high-grade bonds, mortgage securities, and

12   government obligations, Executive Life invested in risky junk bonds with high interest rates.

13   Executive Life's portfolio consisted of 60% junk bonds in comparison to the industry-standard

14   24% at the time of its collapse. This risky behavior allowed Executive Life to make higher payouts

15   to policyholders in the short-term, but its capacity was short-lived.

16       39.    By 1990, many of the Executive Life assets used to fulfill annuity payment

17   obligations were in distress and trading for significantly less than their purchase price. When

18   questioned about the risky makeup of its bond portfolio, Executive Life often pointed to its

19   "impeccable" ratings from major ratings agencies, touting A+ rating from AM Best and AAA

20   rating from Standard & Poor's.

21       40.    On April 11, 1991, California Insurance Commissioner John Garamendi seized

22   Executive Life of California because its financial condition was a threat to policyholders. Up until

23   a week before the seizure, Executive Life maintained a "contingent B-plus" rating from AM Best,

24   meaning that it was still considered "very good" despite a decline in position pending review. Less

than a week later, on April 17, 1991, the New York insurance regulator seized Executive Life of New York. From there, it took only weeks for parent company First Executive to file for bankruptcy protection. Executive Life and ratings agencies obscured the true riskiness of its bond portfolio, and hundreds of thousands of pensioners lost the vested financial security in retirement that their former employers had promised them in exchange for years of dedicated service.

41.    Executive Life of New York was ultimately declared insolvent in 2012. In August 2013, the Guaranty Association Benefits Company ("GABC") was created to liquidate Executive Life of New York. The GABC continues to make payments to annuitants. However, a large number of annuitants experienced losses of 50% or more of their annuity payments. The GABC is expected to make reduced annuity payments until the last annuitant dies, which may not occur for decades.

42.    Two other large insurance companies, First Capital and Fidelity Bankers, also failed near the time of the failures of Executive Life and Executive Life of New York. A study as to the causes of these failures by the United States General Accounting Office ("GAO"), found a common thread: reckless practices of poorly controlled growth and investment in high-risk assets. The assets of the failed insurers grew at a rate six to ten times faster than the life insurance industry's overall asset growth rate, in part due to sales of high-risk investment products. Losses of only 8.3% to 11.7% in these insurers' high-risk investments would be enough to eliminate their surplus and reserves. The insurers artificially inflated their surplus through a heavy reliance on reinsurance transactions. The Executive Life entities could have been declared insolvent as early as 1983—eight years earlier—if they had not masked their true financial condition through the excessive use of reinsurance and borrowed surplus. In short, poorly controlled growth, high-risk holdings coupled with thin surplus, and excessive reinsurance were driving factors in the failures of the Executive Life entities, First Capital, and Fidelity Bankers. Athene engages in the same

1    high-risk practices which the government found were responsible for the collapse of these four

2    insurers. *See infra*, Section III.

3         C.    **Response to Executive Life and Interpretive Bulletin 95-1**

4         43.    In response to Executive Life's collapse and its impact on hundreds of thousands

5    of American retirees, and in order to prevent similar crises in the future, Congress passed the

6    Pension Annuitants Protection Act of 1994, Pub. L. No. 103-401, 108 Stat. 4172 (Oct. 22, 1994)

7    (codified as amended 29 U.S.C. §§ 1132(a)(7), 1132(a)(8), 1132(a)(9), 1132(*l*)(3)(B)), as an

8    amendment to ERISA. Through this amendment, ERISA now provides expressly that plan

9    participants and beneficiaries ejected from the federal pension regulatory system by a plan

10   sponsor's "purchase of an insurance contract or insurance annuity" have a private right of action

11   for appropriate relief including, but not limited to, "the posting of security" as needed to ensure

12   that participants receive their full benefits, plus prejudgment interest. 29 U.S.C. § 1132(a)(9).

13        44.    On March 6, 1995, the Department of Labor promulgated Interpretive Bulletin 95-

14   1, which establishes a framework for ERISA compliance when choosing an annuity provider in a

15   PRT transaction. The Department of Labor instructed fiduciaries that they "must take steps

16   calculated to obtain the safest annuity available, unless under the circumstances it would be in the

17   interests of participants and beneficiaries to do otherwise." Fiduciaries must "conduct an objective,

18   thorough and analytical search for the purpose of identifying and selecting providers from which

19   to purchase annuities."

20        45.    To determine the safest available annuity, Interpretive Bulletin 95-1 requires plan

21   fiduciaries to evaluate the insurer's "claims paying ability and creditworthiness" by considering

22   six factors: (1) the annuity provider's investment portfolio quality and diversification; (2) "[t]he

23   size of the insurer relative to the proposed contract;" (3) "[t]he level of the insurer's capital and

24   surplus;" (4) the insurer's exposure to liability; (5) the structure of the annuity contract and

1    guarantees supporting them; and (6) the availability of additional protection through SGAs. The

2    fiduciaries must "obtain the advice of a qualified, independent expert" if they do not possess the

3    necessary expertise to evaluate these factors properly.

4        **D.    Private Equity Firms**

5        46.    Since Executive Life's collapse, the PRT market has been dominated by traditional

6    annuity providers, including New York Life Insurance Company ("New York Life"). However,

7    more recently, private equity firms have taken on a growing role in the PRT landscape through

8    purchasing life insurers, creating offshore reinsurance affiliates, and serving as affiliated asset

9    managers.

10       47.    The mission of private equity does not align with the interests of annuitants. While

11   private equity firms began by purchasing insurance companies to finance their own operations,

12   today they have moved beyond this business into the lines of private credit and insurance. Not only

13   are private equity firms able to invest cash from premiums into their other affiliated businesses,

14   but they can also generate enormous investment management fees for themselves. They focus on

15   maximizing their immediate financial returns rather than ensuring receipt of the guaranteed

16   pension benefits due to annuitants.

17       48.    The United States Department of the Treasury expressed concerns that the short

18   and long-term objectives and strategy of alternative asset managers are misaligned with the long-

19   term commitment required to fulfill the interests of life insurance policyholders and annuitants.

20   The Department of Labor also conducted a review of Interpretive Bulletin 95-1 through

21   consultation with the Advisory Council on Employee Welfare and Pension Benefit Plans (the

22   "Council"). During a meeting of the Council, several concerns were raised surrounding private

23   equity's increasing role in the insurance and annuity industry, including high investment

24   management fees, conflicts of interest, and the introduction of new risk.

49.    As of 2023, private equity firms spent almost $40 billion on insurance company purchases and controlled over 7% of the industry's assets, double those that they controlled in 2015. Lawmakers and industry experts are also concerned by this trend. U.S. Senator Sherrod Brown of Ohio sent a letter dated March 16, 2022, to the Federal Insurance Office ("FIO") and the National Association of Insurance Commissioners ("NAIC") expressing concerns about the transfer of benefits that workers depend on for their retirement security to risky companies with proven histories of undermining pension and retirement programs.

50.    The increased use of complex investment strategies has led to the greater prominence of illiquid and volatile assets in the private-equity controlled insurers' portfolios, which is in stark contrast to the safe, high-quality corporate bonds that back traditional life insurance policies. These high-risk, high-yield investment strategies allow private equity-owned life insurers to boast higher returns than traditional life insurers, making their bids in PRT transactions seem attractive.

### III.    Athene and Its Financial Risks

51.    Athene Annuity and Life Company is a subsidiary of Athene Holding, Ltd. and was founded in 2009 by Apollo executives as an insurance affiliate. Athene Annuity & Life Assurance Company of New York is a wholly owned subsidiary of Athene Annuity and Life Company that conducts insurance business in New York. As noted, unless otherwise indicated, Athene Annuity and Life Company and Athene Annuity & Life Assurance Company of New York are collectively referred to as "Athene."

52.    On March 8, 2021, Apollo announced its merger with Athene, which was completed in 2022. Apollo was founded by Drexel alumni Leon Black, Josh Harris, and Marc Rowan in 1990, the year Drexel collapsed and entered bankruptcy (and thereby caused the collapse of Executive Life). At the time of the merger, Athene accounted for roughly 40% of Apollo's assets under

management and generated 30% of its fee revenue. Following the merger, Athene became a subsidiary of Apollo. Today, approximately 20% of Athene's portfolio is invested in risky asset-backed securities and leveraged loans, and approximately 80% of its PRT liabilities are reinsured through Bermuda-based affiliates owned by Athene's parent, Apollo.

53.    Athene and Apollo's interdependence is a cause for serious concern. A top ratings agency recently reported that *nearly 25%* of Apollo-owned companies have defaulted since 2022. The failures of these companies were exacerbated by an increase in interest rates. Private equity-owned companies, such as those owned by Apollo, carry increased debt and have lower credit ratings than non-private equity-owned companies, causing them to default at a higher rate. Between January 2022 and August 2024, private equity owned companies defaulted at a rate of 17%. This is double the default rate of non-private equity-owned companies. And since the end of 2020, two-thirds of all corporate defaults came from private equity-backed firms.

### A.    Athene's Complex Investment Structures and Ratings

54.    Athene's use of complex investment structures subject to lax regulatory standards has contributed to its high level of risk as an annuity provider. Athene has established two offshore captive reinsurance subsidiaries, Athene Life Re Ltd. and Athene Annuity Re Ltd., both of which are headquartered in Hamilton, Bermuda. In Bermuda, capital requirements are lower, investment limitations are virtually non-existent, and transparency is minimal to zero. From 2018 to the present, these captive reinsurers have allowed Athene to capture market share using the tax-free status of their reinsurers to leverage lower pricing compared to traditional annuity providers.

55.    For example, the Bermuda Solvency Capital Requirements ("BSCR") require insurers to hold similar levels of capital against both corporate bonds and Collateralized Loan Obligations ("CLOs"), even though some CLO tranches have greater downside risk than bonds with the same credit rating. According to Federal Reserve Board economists, insurance companies,

like Athene, hold some of the riskiest portions of the CLOs issued by their own affiliated asset managers. Athene has a higher-than-average investment in CLOs, and as of September 30, 2023, approximately 35% of its $20.6 billion of CLOs was in one prominent market reporter's unfavorable BBB category, a higher ratio than most other U.S. life industry participants.

56.    Annuity and life insurance companies maintain surplus to ensure long-term solvency. An insurer's surplus, or the difference between its assets and liabilities, is the only barrier between solvency and insolvency. To ascertain whether an insurer is able to pay out policyholder claims, the industry looks to the insurer's "surplus-to-liability ratio," calculated by dividing an insurer's surplus by its liabilities. In the wake of the recent surge in life insurer liabilities and annuity sales spurred by PRT transactions, some life insurers backed by private equity report extremely small surpluses relative to the risk profile of the assets in their portfolios.

57.    Industry professionals recognize that there are four prevalent factors in the insurance industry that are assessed to evaluate the risk profile of an annuity provider. These factors include: (1) adequate surplus relative to the carrier's size and risk profile; (2) the magnitude of the carrier's use of affiliated reinsurance relative to the surplus maintained by the carrier; (3) excessive growth rates of liabilities relative to surplus; and (4) the magnitude of higher-risk, less-liquid investments held in the portfolio relative to the surplus maintained by the carrier. The first two factors are recognized as driving factors leading to an insurer's insolvency.

58.    As of year-end 2023, Athene's surplus-to-liability ratio was only 1.44%. In contrast, a traditional insurer, New York Life, maintained a surplus-to-liability ratio of 12.24%. New York Life, in particular, is a relevant comparison because both insurers have approximately the same amount of total liabilities. As of December 31, 2023, Athene had $199.1 billion in total liabilities, and New York Life had $206.6 billion. Other peer insurers have held sizable surpluses relative to Athene: Teachers Insurance & Annuity Association ("TIAA") (13.83%), Nationwide Life

Schlichter Bogard LLP
100 S. 4th Street, Ste. 1200
St. Louis, MO 63102

Insurance Company ("Nationwide Life") (6.77%), and Pacific Life Insurance Company ("Pacific Life") (6.50%). The national average is over 7%.

59.    When considering the universe of insurance carriers as of December 31, 2023, Athene carries almost the thinnest surplus. Of the 695 active insurance carriers (*i.e.,* those active carriers reporting liabilities), Athene's surplus-to-liabilities ratio ranked 689th (or in the 99th percentile). Just five carriers had a lower (or worse) ratio than Athene. When focusing on the largest insurance carriers with $100 billion in liabilities, Athene ranked 21 of 22 (or in the 95th percentile). Again, just one carrier had a lower ratio than Athene. As shown, Athene's surplus-to-liabilities ratio is staggeringly low when compared to that of its peer insurers and, as such, annuitants whose pensions have been transferred to Athene are at a significantly heightened level of risk compared to the level of risk that they would have assumed had their pensions been transferred to a safer insurer.

60.    Athene touts an ample surplus, but this is misleading. When Athene discusses its surplus, it refers only to that of Athene Holding Ltd., the holding company. An examination of Athene's stand-alone annual statement reveals its actual surplus-to-liabilities ratio, which, as discussed *supra*, is among the thinnest in the country.

61.    Athene's total liabilities have also increased by more than 250% from 2018 to 2023. However, the amount of surplus maintained to support Athene's liabilities has not increased at the same pace. The growth rate of Athene's liabilities has significantly surpassed the national average growth rate in the insurance industry of 29.90%. In contrast, New York Life's liabilities grew at the national average rate (29.92%) over the past five years. Other peer insurers have a dramatically lower growth rate than Athene: TIAA (15%), Nationwide (25%), and Pacific Life (52%). A diligent and thorough investigation into Athene's surplus would have disqualified Athene from being selected as the "safest available" annuity provider based on these factors alone.

62.     Athene also has a high concentration of risky assets relative to its surplus. Higher-risk assets broadly include the following categories: commercial mortgages, mezzanine real estate loans, residential or commercial mortgage-backed securities, derivatives, affiliated party instruments, and "other loan-backed" bonds. For 2022, Athene reported $21 billion in "other loan-backed and structured securities" compared to only $2 billion in surplus. New York Life, on the other hand, reported $11.7 billion for those securities, which was significantly less than its $23.88 billion surplus.

63.     As of the end of year 2023, Athene's ratio of higher risk assets to reported surplus was an astonishing 2,519%, compared to New York Life, whose ratio of higher risk assets to reported surplus was 279%. Athene's riskier assets total approximately $72.4 billion, while New York Life's higher-risk assets total approximately $70.7 billion. But New York Life has maintained a significantly greater surplus than Athene to withstand a write down of these assets. Even a minor write down of Athene's higher-risk assets increases the likelihood of a regulatory event.

64.     Athene also held $18 billion in "Deposit type contracts" for 2022 compared to $2 billion in surplus. These contracts are effectively funding agreement-backed notes and are not reported as debt. Because they are callable by institutional investors, Athene may experience a liquidity crisis to satisfy its pension obligations. During the first six months of 2024, Athene increased its level of funding agreement-backed notes to 38%, up from 11% in 2023. Accordingly, Athene has overstated its actual liquidity, further contributing to the risk assumed by annuitants.

65.     Athene's investment in affiliated assets also illustrates its higher risk because when an annuity provider is hit by a regulatory event, its affiliated investments suffer a more significant and rapid asset value write-down compared to unaffiliated investments. These affiliated investments are highly dependent on affiliated carriers (Athene Annuity Re Ltd.) for operating cash flow. From 2019 through 2023, Athene went from $4 billion to $19 billion in affiliated

Schlichter Bogard LLP
100 S. 4th Street, Ste. 1200
St. Louis, MO 63102

investments, while New York Life's affiliated investments increased from $17 billion to $23 billion during that same time. The percentage increase among these carriers illustrates the dramatic increase in affiliated assets of Athene relative to New York Life. Over the five-year period, Athene's growth in affiliated assets was 368%, whereas New York Life's growth rate was 33%.

66.     Financial entities that combine U.S. life insurers, offshore captive reinsurers, and affiliated asset managers employ what is called a "Bermuda Triangle Strategy." The insurer (Athene) firsts builds a block of annuity business, often through a pension buy-out, and then cedes its insurance liabilities to an affiliated offshore reinsurer (Athene Life Re), thereby freeing up capital for its private debt business. The affiliated asset manager (Athene Asset Management) then originates, acquires, and manages private debt.

67.     Bermudian reinsurers issue financial statements under Bermuda accounting standards rather than under the United States Statutory Accounting Principles ("U.S. SAP"). Bermuda does not follow the same detailed reporting standards. Under U.S. SAP, insurers are required to file detailed statutory financial statements that report all individual purchases and sales of securities. For fixed-income investments, U.S.-based insurers report all individual stock and bond purchases and sales by unique identifier for registered securities. By contrast, in Bermuda, Athene's affiliated reinsurers report only aggregate data without individual purchases or sales. Bermuda also allows insurers to invest in assets that would not qualify as suitable under U.S. SAP.

68.     Although Bermuda received qualified jurisdiction reciprocal status from the NAIC in 2019, both U.S. regulators and the NAIC still consider insurers' reliance on offshore reinsurance as a current and substantial threat to policyholders. Just this year, in March 2024, the NAIC and regulators scrutinized the escalating trend of life insurance and annuity reserves being ceded offshore because such practices lack sufficient regulatory oversight and result in a substantial credit risk to the offshore reinsurance sector. The NAIC's Life Actuarial Task Force emphasized the need

for improved governance and transparency in these offshore transactions. In October 2024, the NAIC's Life Actuarial Task Force endorsed adopting asset adequacy testing over reinsurance transactions because these transactions lower the transparency of reserves held and the risks associated with the assets supporting the reserves. An industry participant noted during the NAIC meeting that, based on firsthand experience, when business moves offshore through reinsurance, the amount of assets backing policyholder obligations declined significantly.

69.    Moody's recently found that the movement of reinsurance offshore is a "credit negative" for the life insurance sector as a whole. A state insurance regulator who is also an NAIC actuary voiced concerns with offshore reinsurance because, compared to reserves regulated by U.S. SAP, offshore reserves can be substantially lower, can disappear entirely, or in the worst cases, can even be negative. According to the assistant commissioner of New Jersey's Office of Solvency Regulation, the recent increase in the use of offshore reinsurance is due in large part to the fact that offshore reinsurance provides life insurers the ability to greatly reduce their reserves. When states periodically examine insurance companies, they do not even consider offshore reinsurers that are often under-reserved.

70.    While reinsurance with a third-party reinsurer can increase protections for policyholders, the same is not true of offshore affiliated reinsurance. Instead of reinsuring through a third-party reinsurer to diversify risk, Athene "cedes" reinsurance to captive affiliates. As of year-end 2023, Athene reported over $155 billion in assets reinsured with affiliates. Athene's total liabilities reinsured by captives totaled over 5,000% of its surplus. In contrast, New York Life maintains *zero* affiliated reinsurance.

71.    Beyond traditional reinsurance, Athene also engages in significant Modified Coinsurance ("ModCo") transactions that further disguise its true risk level. ModCo is a type of reinsurance. In ModCo transactions, an insurer (the ceding carrier) transfers regulatory capital

1    requirements associated with its asset risks to a reinsurer while retaining the assets themselves. In

2    2022, Athene reported ModCo transactions totaling $104 billion compared to only $2 billion in

3    surplus. For 2023, Athene reported ModCo transactions totaling over $141 billion relative to only

4    $2.9 billion in surplus. In contrast, New York Life, TIAA, Nationwide Life, and Pacific Life

5    reported *no* ModCo with offshore affiliates.

6    72.    Conducting ModCo transactions with Bermuda-based captive reinsurers, like

7    Athene, simply involves swapping insurance risks among commonly controlled companies for the

8    purpose of avoiding U.S. SAP requirements and artificially inflating Risk-Based Capital ("RBC")

9    ratios. The RBC ratio measures the amount of capital or surplus an insurer must maintain to pay

10   policyholders (or annuitants) based on its level of risk. RBC ratios are inflated because ModCo

11   arrangements allow Athene to remove risky assets from its RBC ratio. And the use of higher-risk

12   assets enables Athene to value its liabilities at a lower rate. In offloading capital requirements and

13   asset risks to a captive reinsurer through an ultimately circular ModCo transaction, Athene

14   obscures the actual risks associated with the assets involved and is enabled to maintain a lower

15   level of surplus.

16   73.    The interdependence among Athene and its in-house, Bermuda-based reinsurers

17   reporting under Bermudian standards exposes each of these entities to a heightened risk of failure.

18   Should Athene's separate account and then general account be insufficient to cover its liabilities,

19   Athene would be forced to seek payment from its affiliated reinsurer for a portion of the annuity

20   liabilities. These closely correlated events are tied to Athene's weak financial condition relative to

21   other insurers. Because Athene is dramatically under-reserved relative to peers, as shown through

22   its thin surplus and dramatic increase in liabilities, in a liquidity crisis or shortfall, it would be

23   entirely dependent on IOUs from its own captive in-house reinsurers, or, in other words, itself.

24

Furthermore, an inability to satisfy Athene's general account obligations would cause a downgrade in its credit, preventing it from raising funds in the credit markets.

74.    Moreover, Athene claims to have a "separate account" to pay Plaintiffs' and other similarly situated Weyerhaeuser retirees and beneficiaries their benefit payments. But, on information and belief, this separate account is not truly "ring-fenced" or insulated from Athene's general liabilities. According to GACs issued by Athene for other PRT transactions, the separate account not only holds assets supporting the contract, but assets in the separate account may also be used to support Athene's payment obligations under other, separate GACs issued by Athene. Periodically, Athene may also withdraw assets from the separate account and transfer them to its general account if the market value of the assets in the separate account exceeds Athene's liabilities under the GAC.

75.    Because Athene houses most of its business in Bermuda, its holding company, Athene Holding, Ltd., primarily relies on dividends from its Bermudian operating companies. To further complicate this structure, Athene Holding, Ltd. is not a pure insurance holding company. It is part of Apollo, which has a large asset management business in addition to Athene's insurance operations.

76.    An analysis of Athene's transfer activity among affiliates further illustrates the heightened risk of Athene due to the interdependence among captive affiliates. Athene Annuity Re Ltd of Bermuda had $87 billion in assets on its books in 2020. Circular transactions between Athene and both its offshore and U.S. affiliates totaled $115.7 billion in 2021. If only a fraction of that reinsurance transferred in 2021 was disallowed, Athene would face a funding shortfall. A funding shortfall for Athene would directly impact Apollo because Athene-affiliated insurance companies represent 40% of Apollo's value.

77.     Apollo has specifically recognized the conflicts of interest that arise in PRT transactions involving its affiliated companies. These PRTs may lead to conflicts of interests when affiliates determine the premium to be paid for the group annuity contracts or the amount of investment management fees charged by Apollo for managing the underlying assets and liabilities of the pensions. Although there are efforts that can be taken to mitigate these conflicts, Apollo has not taken any such steps.

78.     Athene's transition out of the life insurance business further contributes to its higher risk as an annuity provider. The provision of life insurance by an insurance provider is considered a natural hedge to its annuities business. In 2013, most of Athene's life insurance business was acquired by Accordia Life and Annuity Company, and by 2016, Athene completely transitioned out of the business. Therefore, this important hedge to Athene's annuity business no longer exists.

**B.      Athene Shares Common Characteristics with Recently Failed Insurers.**

79.     Athene's practices resemble those of recently failed insurers in several critical respects. These practices have been recognized by industry professionals as having caused past failures and creating a substantial likelihood of default or insolvency.

**1.      Recently Failed Insurers Engaged in Similar Higher-Risk Practices.**

80.     In 2024, four insurance companies failed: Columbian Life Insurance Company ("Columbian Life"), Columbian Mutual Life Insurance Company ("Columbian Mutual"), PHL Variable Insurance Company ("PHL Variable"), and 777 Reinsurance Ltd. ("777 Re"). Their failures demonstrate that the same practices that caused Executive Life's failure persist, including surplus inadequacy, risky financial practices, and inadequate risk management, among others.

81.     Columbian Life was part of a complex network of affiliated entities under parent company Columbian Mutual. Like Athene, Columbian Life and its affiliates held complicated and intertwined financial obligations to one another and engaged in multiple levels of offshore

reinsurance. Ultimately, these circular and affiliated transactions, coupled with the company's declining financial health and inadequate reserves, led to its insolvency. Columbian Mutual's complex and opaque structure and involvement in affiliated transactions allowed the company to disguise its growing financial strain until regulatory intervention was both inevitable and necessary.

82.     Before its takeover by regulators, an independent actuarial analysis by the New York Department of Financial Services found Columbian Life's reserves to be significantly deficient. The company needed to increase its reserves by $104 million. Shortly thereafter, Columbian Life was placed into rehabilitation by the Illinois Department of Insurance. In August 2024, Columbian Mutual was placed into rehabilitation in New York as well, and their policyholders remain at substantial risk.

83.     PHL Variable faced financial challenges similar to those faced by Columbian Life, including, among other things, underperforming investments and a prolonged low-interest-rate environment. PHL Variable attempted to stabilize itself through reinsurance transactions, including with its captives. When these efforts proved futile, regulators took over PHL Variable and initiated rehabilitation proceedings to protect policyholders and stabilize the company. As discussed, Athene engages in the same risky practice of using an excessive amount of affiliated reinsurance relative to its surplus.

84.     A common theme among collapsing insurers is the pursuit of higher returns through less liquid, more volatile assets and the use of opaque, affiliated reinsurance transactions. These strategies can generate short-term profits but expose insurers, like Athene, to substantial risk if market conditions change, leaving them unable to liquidate assets to meet policyholder demands.

85.     Much like other failed insurers, 777 Re, a Bermuda-based entity, engaged in complex and opaque financial arrangements with affiliates. Through these transactions, 777 Re's

parent company (777 Partners) shifted liabilities off its balance sheet and misled regulators and investors into believing that it was financially sound. In reality, the affiliated reinsurance transactions just obscured 777 Partner's significant exposure and perilous financial status. Similar to Columbian Mutual, policyholders remain exposed.

86.     In addition to offshore reinsurance, 777 Re's portfolio contained high levels of risky and illiquid assets for the sake of higher returns. This strategy proved unsustainable, particularly when market conditions shifted, and contributed greatly to 777 Re's insolvency. While these strategies of engaging in offshore, affiliated reinsurance transactions and holding high concentrations of risky assets can improve a company's financial position on paper and allow it to boast high returns, the risks introduced are significant, especially for those reinsurers that are undercapitalized and domiciled offshore.

### 2.    Athene's Similarities to Failed Insurers

87.     Athene's surplus-to-liability ratio is comparable to three recently failed insurers: Columbian Life, Columbian Mutual, and PHL Variable. As of year-end 2023, Athene had a surplus-to-liability ratio of 1.44%. Columbian Life and Columbian Mutual actually had *higher* surplus-to-liability ratios, 3.01% and 2.10%, respectively. As of year-end 2022, the last year that PHL Variable reported a positive surplus, its surplus-to-liability ratio was 1.03%. As previously indicated, all four ratios are dramatically below the national average of 7.49%.

88.     Additionally, similar to these failed insurance companies, Athene engages in affiliated reinsurance that far exceeds its surplus. As of December 31, 2023, Athene's use of affiliated reinsurance was *fifty-four* times the amount of its surplus. Columbian Life's use of affiliated reinsurance was *sixty* times the amount of its surplus, Columbian Mutual's was *twenty* times, and PHL Variable's was *ninety* times. In contrast, New York Life does not engage in *any* affiliated reinsurance.

Schlichter Bogard LLP
100 S. 4th Street, Ste. 1200
St. Louis, MO 63102

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**C.     Athene's Poor Credit Rating and Risky Offshore Practices**

**1.     Objective Measures Illustrate that Athene was not a Reasonably Safe Annuity, let alone the Safest Annuity Available.**

89.     NISA Investment Advisors, LLC ("NISA") is an asset management firm with over thirty years of experience and nearly $500 billion in assets under management that specializes in liability-driven investments and de-risking strategies for defined benefit plans. NISA performed a study that found Athene to be far riskier than multiple traditional annuity providers. The report, dated October 13, 2022, evaluated the creditworthiness of nine PRT insurance providers, including Athene.[1] NISA performed its evaluation consistent with the framework outlined by Interpretive Bulletin 95-1. The report found that PRT transactions issued by lower-quality annuity providers harm annuitants by as much as $5 billion annually through uncompensated credit risk.

**FIGURE 2. Quantifying the Economic Loss to Beneficiaries (ELB) Due to Credit Risk**

| Issuer | Observed Market Spread | Market Price of Bond's Risks Over Treasuries | Economic Loss to Beneficiaries (ELB) of Choosing Insurer | Market Assessment of Safest Annuity Available |
|---|---|---|---|---|
| (A) NY Life | 74 | 7.4% | 0.0% | CLEAR CANDIDATES |
| (B) Prudential | 76 | 7.6% | 0.2% | CLEAR CANDIDATES |
| (C) MassMutual | 84 | 8.4% | 1.0% | CLEAR CANDIDATES |
| (D) AIG | 102 | 10.2% | 2.8% | POTENTIAL CANDIDATES BUT EXTRA SCRUTINY REQUIRED |
| (E) MetLife | 106 | 10.6% | 3.2% | POTENTIAL CANDIDATES BUT EXTRA SCRUTINY REQUIRED |
| (F) Principal | 147 | 14.7% | 7.3% | POTENTIAL CANDIDATES BUT EXTRA SCRUTINY REQUIRED |
| (G) PacLife | 158 | 15.8% | 8.4% | QUESTIONABLE CANDIDATES: DEMANDS EXTENUATING CIRCUMSTANCES |
| (H) F&G | 186 | 18.6% | 11.2% | QUESTIONABLE CANDIDATES: DEMANDS EXTENUATING CIRCUMSTANCES |
| (I) Athene | 214 | 21.4% | 14.0% | QUESTIONABLE CANDIDATES: DEMANDS EXTENUATING CIRCUMSTANCES |

Source: Bloomberg, NISA calculations.

90.     To perform the evaluation, NISA computed the credit spread differences "between insurers into the implied cost that beneficiaries bear to individual insurance companies," finding

---

[1] Eichorn, David, *Pension Risk Transfers (PRT) May Be Transferring Risk to Beneficiaries*, NISA, 2022, https://www.nisa.com/perspectives/pension-risk-transfers-prt-may-be-transferring-risk-to-beneficiaries/.

Schlichter Bogard LLP
100 S. 4th Street, Ste. 1200
St. Louis, MO 63102

"the range of credit risk costs reaching as high as 14%." As shown above, NISA quantified the economic loss to beneficiaries due to credit risk, placing Athene dead last among annuity providers. The NISA report demonstrates that Athene is a much riskier annuity provider than traditional options.

91.     Other objective measures from the NISA report further illustrate that Athene was not the safest available annuity. The bond market uses spread to measure the creditworthiness of bonds issued by insurers because there is an inverse relationship between spread and credit rating. As seen in the chart, Athene had the highest reported spread of 214 basis points ("bps"). Accordingly, all else equal, an investor demands additional compensation for taking more credit risk to hold one bond that has a higher spread than another bond from a different issuer with a lower spread. But annuitants in a PRT transaction, whose payments are fixed, are unable to secure additional compensation for assuming higher risk from a low-quality annuity provider like Athene.

92.     Athene was also classified by NISA as a "Questionable Candidate" demanding "extenuating circumstances" to be considered as a provider for a PRT. The reported market spread, market price for risks assumed, and economic loss to annuitants are all significantly higher than the same measures for other annuity providers, such as New York Life. At least three providers were found to be "Clear Candidates" to be selected as an annuity provider for a PRT. Athene is thus far from the "safest available" annuity in the market or an annuity that would otherwise best promote retirees' interests in ensuring the long-term security of their pension benefits.

93.     As stated in Interpretive Bulletin 95-1, "[a]lthough ratings provided by insurance rating services may be a useful factor in evaluating a potential annuity provider, reliance solely on such ratings would not be sufficient to meet the requirement of a thorough and analytical search for an appropriate annuity provider." In light of this guidance, NISA separately compared the agency rating of Athene to the market-adjusted implied rating.

FIGURE 1. The Market's View: There is a Very Wide Range of Provider Creditworthiness

| | (A) NY Life | (B) Prudential | (C) MassMutual | (D) AIG | (E) MetLife | (F) Principal | (G) PacLife | (H) F&G | (I) Athene |
|---|---|---|---|---|---|---|---|---|---|
| Agency Rating | AAA | AA- | AA+ | A | AA- | A+ | AA- | A- | A+ |
| Market Implied Rating | AA | AA | AA | A+ | A | A- | BBB+ | BBB | BBB- |
| Observed Market Spread | 74 | 76 | 84 | 102 | 106 | 147 | 158 | 186 | 214 |

Note: In our opinion, when the DOL warned fiduciaries that they may not rely solely on ratings they were making it clear that a high rating would not be an effective safe harbor. For example, a AAA rated insurer is not appropriate when it is known to have higher credit risks. But can lower Agency ratings be ignored when the market is corroborating this assessment, or in this case, taking a dimmer view on the insurers credit quality?

Source: Bloomberg, 8/31/2022 NISA calculations.

94.      The reported range above is the median between the ratings reported by established rating agencies: Standard & Poor's Rating Services ("S&P"), Moody's Investor Service, Inc. ("Moody's"), and Fitch Ratings ("Fitch").

95.      NISA found that although Athene had an agency rating of A+, its implied rating was BBB-, the lowest rating among all reported annuity providers. Accordingly, reliance on Athene's credit ratings would be insufficient to appropriately evaluate Athene as a potential provider.

96.      Athene touts its safety based on its A+ credit rating, but this is misleading. There are multiple levels of safety above A+, including AA and AAA. Insurers with greater

creditworthiness maintain these comparatively higher credit ratings. These differences in credit ratings correspond to insurers' likelihood of default.

97.     For instance, Athene maintains an A rating issued by Moody's, in contrast to New York Life's Moody's-issued AAA. Moody's reported average cumulative issuer-weighted default rates based on these credit ratings from 1970 through 2021, and the differences are stark. Over a 20-year time horizon, which is likely an even shorter horizon than would be relevant to the obligations owed to many pensioners, riskier insurers' default rates become apparent. While Moody's AAA ratings default at a rate of 0.7%, the default rate for its A ratings is almost *seven* times higher at 5.0%. If extended to a 30-year time horizon, this differential would be expected to grow exponentially.

### 2.    Athene Relies on Unreliable Private Letter Rulings.

98.     Athene depends on private letter rulings ("PLRs") from smaller, private credit rating agencies. These private rating agencies apply less stringent standards than public ratings from the Securities Valuation Office ("SVO") of the NAIC and those provided by major credit reporting agencies. There are also significant discrepancies among securities ratings provided by private ratings agencies—Kroll Bond Rating Agency ("KBRA"), DBRS Inc. ("DBRS"), and Morningstar—and those by the major ratings agencies—S&P, Moody's, and Fitch. In fact, PLRs issued by these small, private ratings agencies averaged 2.4 notches higher than ratings provided by the SVO for the same security. Athene obtained ratings from both KBRA and DBRS each year from 2017 through 2023.

99.     In 2019, the Wall Street Journal ("WSJ") reported the same discrepancies among structured security ratings as they related to bonds, including CLOs: smaller, private rating agencies were more likely to provide higher grades than the major ratings agencies on the same bonds. For example, this resulted in the classification of a bond as "junk" by major rating agencies

Schlichter Bogard LLP
100 S. 4th Street, Ste. 1200
St. Louis, MO 63102

whereas the smaller, private credit rating agencies would rate that same bond as very safe (AAA). The NAIC found similar discrepancies. These differences in credit ratings have an adverse impact on capital requirements under the RBC framework. For example, if a security is given a higher credit from a private rating agency as compared to the SVO, an insurer could end up with lower RBC requirements than are actually warranted, which may lead to the insurer being undercapitalized relative to the actual risk in its portfolios.

100.    Both KBRA and DBRS have been subject to investigations by the SEC regarding their rating practices, resulting in millions of dollars in fines. One investigation unveiled that KBRA's ratings failed to adequately assess the probability that the issuers will default or otherwise make payments in accordance with the terms of the security. Despite years of documented wrongdoing by KBRA and DBRS and their extensive failures to comply with SEC credit rating policies and procedures, Athene continues to retain both companies for rating risky securities in its portfolio.

**D.    Athene Has Been Subject of Investigation by Insurance Regulators.**

101.    Athene's PRT business has been investigated by the State of New York for misconduct and was found to have violated New York law. Relative to other states, New York maintains some of the strictest standards on insurers. In January 2019, the New York Department of Financial Services investigated Athene Annuity and Life Company and Athene Holding Ltd., concluding that Athene Annuity and Life Company violated New York law by transacting insurance business related to its PRT business without a license from the State. As a result of the investigation, Athene Annuity and Life Company and Athene Holding Ltd. were jointly ordered to pay a $45 million civil penalty and satisfy other conditions. These other conditions included, among other things, prohibiting Athene Annuity and Life Company from soliciting, negotiating,

selling, or servicing any PRT transactions, group annuity contracts, or related certificates in New York except through its subsidiary, Athene New York.

## IV. State Street Was Not Independent Because, Through Its Parent, Has Been a Major Shareholder of Weyerhaeuser and Apollo.

102.    Since at least 2010, State Street, through its parent (State Street Corporation), has held a substantial ownership interest in Weyerhaeuser's publicly traded securities. Between 2013 and 2018, in particular, State Street held shares of Weyerhaeuser representing an ownership interest between 5.82% ($793 million) and 7.75% ($641 million), respectively. By 2023, State Street's ownership interest increased to approximately 10.35%, valued at approximately $1.1 billion.

103.    State Street, through its parent (State Street Corporation), has a similar ownership interest in Apollo, Athene's parent company. Prior to the PRT transaction at issue, State Street held no publicly traded shares in Apollo. By 2019, State Street owned Apollo shares valued at approximately $5.6 million. However, between 2020 and 2023, State Street's ownership of Apollo has grown exponentially from $162.41 million to $1.1 billion, making State Street the seventh largest institutional investor. State Street also provides custodial services for Athene insurance products.

104.    Ownership of Weyerhaeuser gave State Street substantial shareholder voting powers. As a large shareholder of Weyerhaeuser, State Street is entitled to vote on a wide range of corporate strategic and governance issues, including those relating to the appointment, composition, and pay of board members. Shareholders, including proxy shareholders, generally receive ballots each year that also generally include proposals for strategic investments.

105.    Studies show that large shareholders have an incentive to provide more favorable advice for the management of public companies that are their clients than for others that are not, and such incentives often exist. Public companies (like Weyerhaeuser) are incentivized to buy

COMPLAINT                                    34                           Schlichter Bogard LLP
                                                                          100 S. 4th Street, Ste. 1200
                                                                          St. Louis, MO 63102

products and services from their large shareholders (like State Street) so that the large shareholders maintain or increase their ownership positions. These relationships incentivize large shareholders to exercise their proxy voting power to favor management-friendly resolutions.

106.    Given its significant holdings of Weyerhaeuser's common stock, State Street had the ability to influence Weyerhaeuser's strategies and activities. And it had an interest in favoring Weyerhaeuser by selecting an annuity provider that provided reduced premium payments relative to established and reputable insurance providers, thereby providing a direct financial benefit to Weyerhaeuser and its shareholders. Accordingly, State Street did not act as an "independent" fiduciary with respect to the Weyerhaeuser PRT transaction. Instead, State Street's interests were directly aligned with the Weyerhaeuser Defendants' and Athene's: to maximize profit, even if this meant choosing an annuity provider that did not offer the safest annuity available.

## V.    The Weyerhaeuser-State Street-Athene PRT in 2019

107.    On January 23, 2019, Weyerhaeuser entered into a Commitment Agreement with Athene and State Street to purchase GACs from Athene. The terms of which were proposed by Athene only five days (two business days) earlier on January 19, 2019. Through the purchase of the GACs, Weyerhaeuser transferred its pension obligations for approximately 28,500 retirees and beneficiaries to Athene. Weyerhaeuser's obligations were assumed by Athene, thereby reducing Weyerhaeuser's pension obligations by approximately $1.5 billion through the payment of Plan assets. And through the transaction with Athene, Weyerhaeuser expected to recognize a non-cash, pre-tax pension settlement charge of approximately $450 million in the first quarter of 2019.

108.    The Weyerhaeuser Defendants selected State Street to serve as the Plan's independent fiduciary over the selection of annuity provider to assume Weyerhaeuser's pension obligations. The Commitment Agreement specified that State Street was appointed as the "independent fiduciary" to: (1) be the sole fiduciary responsible to select one or more insurers in

compliance with ERISA; (2) determine if the transaction and contract satisfy ERISA; (3) represent the interests of the Plan and its participants and beneficiaries in negotiating the terms of the contract; (4) direct the Plan Trustee on behalf of the Plan to transfer the premium; and (5) take all other actions on behalf of the Plan necessary to effectuate the PRT.

109.    In making the selection of an annuity provider in a PRT transaction, State Street claims that it selects insurance providers in accordance with the Department of Labor's Interpretive Bulletin 95-1. As the Plan's purported "independent fiduciary," State Street was held to the same stringent fiduciary standards as the Weyerhaeuser Defendants. For its fiduciary services, State Street received meaningful financial compensation from the Plan in 2019.

110.    Weeks after the Commitment Agreement, on February 1, 2019, Weyerhaeuser informed Plan participants that it had appointed State Street as the independent fiduciary charged with choosing an annuity provider and that Athene was selected to assume responsibility for their monthly pension benefits through the purchase of GACs. Weyerhaeuser selected Athene based on State Street's recommendation and advised Plan participants that State Street had complied with ERISA, "including Department of Labor Interpretive Bulletin 95-1."

111.    Athene began making pension payments to Plaintiffs and similarly situated persons beginning on May 1, 2019.

112.    Athene is now solely responsible for paying the pension benefits of the former Plan participants and beneficiaries covered by the transaction, who are no longer subject to ERISA's protections for employee benefits, including the backstop provided by the PBGC. Even though Weyerhaeuser retirees had no ability to choose their annuity provider, Plan assets transferred to Athene in connection with the at-issue PRT transaction cannot be withdrawn by retirees.

113.    Athene's obligation to Plaintiffs and similarly situated Weyerhaeuser retirees likewise is irrevocable. Thus, the individuals affected by the transaction are exposed to the

substantial risk that Athene's risky, Bermuda-based activities may render it insolvent and thus unable to perform its obligations to Plaintiffs and other similarly situated Weyerhaeuser retirees and beneficiaries. Thus, a Weyerhaeuser retiree with a lower risk appetite did not have the option to transfer benefits to a safer, less risky alternative.

**VI.    Defendants Acted in Their Own Self-Interest in Selecting Athene.**

114.    The prevailing circumstances demonstrate that Defendants violated their fiduciary responsibilities by selecting Athene as the Plan's annuity provider. Had Defendants conducted an impartial investigation of available annuity providers, they would have discovered that Athene did not best promote the interests of the affected retirees and was nowhere close to the safest available option to select as an annuity provider.

115.    An impartial and thorough investigation would have detected numerous factors contributing to Athene's far higher risk than traditional annuity providers, including that Athene: (i) lacks a sufficient track record to guarantee pension liabilities; (ii) uses an investment strategy to invest in riskier assets; (iii) uses reinsurance of annuities with offshore companies affiliated with Athene, which are regulated by Bermuda standards, not by U.S. SAP; (iv) overvalues its assets and understates its liabilities; (v) has an inferior creditworthiness; and (vi) uses unreliable credit rating agencies, among others. In a market with numerous providers who are vastly better qualified, no prudent or loyal fiduciary under the circumstances would have transferred retirees' pension benefits to Athene. Thus, it is evident that Defendants did not engage in an independent and thorough investigation of available providers before selecting and transferring pension benefits to Athene. The risks posed by Athene would have been known and readily ascertainable to any prudent and loyal fiduciary.

116.    It is a customary industry practice for fiduciaries selecting a PRT provider to solicit competitive bids or proposals from numerous insurers to identify the candidate that will best

1    promote the participants' and beneficiaries' interest in the continued security of their pensions. In

2    light of the extensive information available to Defendants that would have compelled a truly

3    impartial and prudent fiduciary to reject Athene given its inferior creditworthiness and other

4    deficiencies relative to traditional annuity providers, it is evident that Defendants either did not

5    solicit proposals from other providers or made a predetermined decision to select Athene despite

6    its glaring deficiencies relative to establish providers in the market. Without a truly independent

7    and objective evaluation of a range of available annuity providers, Defendants could not reach a

8    reasoned conclusion that using Athene as the Plan's annuity provider was prudent or in the best

9    interest of the Plan's participants.

10    117.    Although the Weyerhaeuser Defendants ostensibly hired State Street as an

11    independent fiduciary to select Athene, the Weyerhaeuser Defendants maintained full

12    responsibility as appointing fiduciaries to monitor State Street to ensure that it carried out its

13    fiduciary obligations loyally and prudently. A monitoring fiduciary must take prompt and effective

14    action to protect the plan and its participants when the delegate fails to discharge its duties. The

15    Weyerhaeuser Defendants also had a duty to prevent any fiduciary breach by State Street in the

16    selection of Athene as the annuity provider and to ensure that State Street was performing its

17    delegated tasks in accordance with ERISA's fiduciary standards. The Weyerhaeuser Defendants

18    failed to prudently discharge their fiduciary duties in monitoring State Street.

19    118.    Interpretive Bulletin 95-1 instructs fiduciaries that a desire to save costs can "*never*

20    justify . . . purchasing an unsafe annuity.*" 29 CFR § 2509.95-1(d) (emphasis added). On

21    information and belief, the choice of Athene conferred economic benefit on Weyerhaeuser in the

22    form of reduced premium payments relative to the cost of a safe annuity from an established and

23    reputable insurance provider, such as New York Life.

24

COMPLAINT                        38                        Schlichter Bogard LLP
                                                          100 S. 4th Street, Ste. 1200
                                                          St. Louis, MO 63102

119.    Even in the improbable event that Athene's pricing had not been more favorable to Weyerhaeuser than that of traditional annuity providers, no prudent fiduciary would opt for a riskier annuity if a safer annuity was available for the same price. Likewise, in accordance with Interpretive Bulletin 95-1, no prudent fiduciary would rely solely on Athene's credit ratings when determining the safest annuity provider available.

120.    It is apparent that Defendants' conflicts of interest infected the fiduciary decision to select Athene. Prior to 2019, the Plan had been underfunded (by $1.28 billion in 2017 and by $333 million in 2018). By transferring Weyerhaeuser's pension obligations to Athene, Weyerhaeuser was able to dramatically reduce its pension liabilities and enhance its corporate profits, resulting in a settlement charge of approximately $449 million, even when those actions come at the expense of retirees. Thus, the Weyerhaeuser Defendants had a strong motivation to select the lowest-cost provider, thereby mitigating Weyerhaeuser's pension obligations.

121.    The Weyerhaeuser Defendants' hiring of State Street did not eliminate this self-interest. Despite claiming its "independence," State Street is a for-profit business. As one of the largest shareholders of Apollo, it had a financial incentive to use Athene as the annuity provider in PRTs, which has been shown through its actions. Since 2018, State Street caused plan fiduciaries to select Athene in no fewer than ten PRTs, shifting more than $30 billion in pension liabilities from the federally regulated pension system to Athene. For 2019, in particular, Weyerhaeuser's and State Street's PRT transaction with Athene represented approximately 25% of Athene's pension group annuity sales, or $1.5 billion of the $6 billion.

122.    Moreover, as an experienced investment consultant, State Street certainly understood that its client's motivation in offloading pension obligations was to enhance corporate profits by reducing pension liabilities. Thus, State Street certainly understood that selecting the lowest-cost candidate without regard to safety would advance its client's interests, while selecting

the safest—but more expensive—provider would undermine Weyerhaeuser's financial goals. Given that Athene was a clearly inferior choice based on objective measures of relative safety, it is apparent that State Street put the financial interests of Weyerhaeuser and itself over those of the retirees to whom it owed fiduciary duties.

123.    As the number of PRT transactions has dramatically increased in recent years due to more firms entering the space, Milliman reported that the spread between average and competitive bids has widened, emphasizing the significant role of fiduciaries to ensure that low bidders are not taking undue risks. This wider range in premiums is shown below:



124.    Other sources confirm the trend of employers in PRT transactions selecting the lowest-cost annuity provider. Among partial buyouts completed in 2022, Aon reported that employers (or plan sponsors) chose the lowest cost annuity in 78% of partial buyout transactions. As previously noted, the transaction at issue was a partial buyout.

125.    The Weyerhaeuser Defendants received an economic benefit from using Athene in the form of reduced premium payments relative to what they would have paid to an established and reputable insurance provider, such as New York Life, to provide the same pension benefits to Plan participants.

COMPLAINT                                40                    Schlichter Bogard LLP
                                                              100 S. 4th Street, Ste. 1200
                                                              St. Louis, MO 63102

1

2

**VII.    The PRT Transaction Substantially Diminished the Value of Plaintiffs' Pension Benefits and Substantially Interfered with Plaintiffs' Future Payment Rights.**

126.    Defendants' decision to choose or cause Athene to be selected as the annuity provider in the PRT transaction immediately harmed, and will continue to harm, participants and beneficiaries over an extended period through uncompensated risk. The PRT transaction with Athene immediately diminished the present value of Plaintiffs' and other similarly situated Weyerhaeuser retirees and beneficiaries' pension benefits.

127.    The market for annuities sets the value for the same or similar future stream of payments issued by different annuity providers. The market measures Athene as up to 14% riskier than traditional annuity providers, including New York Life. Investors in the market demand a risk premium in exchange for exposure to higher risk. Weyerhaeuser retirees and their beneficiaries receive no additional compensation for taking on the additional risk associated with the transfer of their pension benefits to Athene. When an annuitant receives the same payments, but from a less creditworthy issuer, the annuitant experiences a loss. This is because the market assigns a lower price for an annuity issued by a riskier provider to cover a similar stream of future payment obligations to compensate the annuitant for the additional risk of future loss. The price (*i.e.*, present value) of future annuity payments is determined by the rate of return or discount rate. The higher the discount rate to compensate an annuitant for assuming additional risk of loss, the lower the present value of the annuity.

128.    Following the PRT transaction with Athene, the value of Weyerhaeuser retirees and beneficiaries' pension benefits and rights of future retirement payments for Plan participants is substantially less than it would be had Defendants selected a more traditional, reputable, and stable annuity provider instead of Athene. Because of these providers' high credit quality, they ensure a greater likelihood that retirees will receive their full pension. If the Athene GACs at issue here

Schlichter Bogard LLP
100 S. 4th Street, Ste. 1200
St. Louis, MO 63102

were offered on the open market alongside traditional issuers' annuity products with identical terms and for the same price, then any rational retirement investor would choose any one of the traditional issuer's annuity products and would not choose Athene's. Alternatively, a rational retirement investor would insist on paying a lower price for the Athene-issued annuity, as its present value is substantially less than most other traditional, reputable, and stable annuity products' present values. The diminution in present value of Plaintiffs' and similarly situated Weyerhaeuser retirees and beneficiaries' pension benefits as a result of Defendants' wrongful acts and omissions is substantial.

129.    For instance, the Athene 10- and 20-year annuities have a higher credit spread relative to U.S. Treasuries than those issued by other insurers. Because of their higher credit spread, Athene annuities have higher risk relative to annuities offered by other insurers. Thus, a higher-risk annuity is worth measurably less than lower-risk annuities offered by creditworthy issuers because annuitants are not compensated for the additional risk they assume. Thus, a rational investor—and a prudent and loyal fiduciary—if offered an identical annuity from a traditional insurer, would not select Athene.

130.    After the PRT transaction, the risk that Plaintiffs and similarly situated persons will not receive the benefits to which they are entitled is substantial. Because Weyerhaeuser's obligation to pay Plaintiffs' pension benefits was offloaded to Athene, Plaintiffs are no longer members of the Plan and their retirement benefits are not backed by the Plan, Weyerhaeuser, or the PBGC. Their pension benefits were safer when they had these protections under ERISA. The PRT transaction thus greatly increased the risk—and indeed introduced a substantial risk—that Plaintiffs will not receive the retirement benefits they earned and are owed. Defendants' selection of Athene injured Plaintiffs the very moment the transaction was completed.

1    131.    The selection of Athene injured Plaintiffs the moment the transaction was executed

2    because, at that moment, the present value of Plaintiffs' promised benefits was substantially and

3    quantifiably diminished.

4                            **CLASS ACTION ALLEGATIONS**

5    132.    Plaintiffs seek class action certification on behalf of all similarly situated persons

6    whose benefit payments were transferred from the Weyerhaeuser Pension Plan to Athene Annuity

7    and Life Co. or Athene Annuity & Life Assurance Company of New York after January 23, 2019.

8    133.    This action meets the requirements of Rule 23 and is certifiable as a class action for

9    the following reasons:

10         a.    The proposed class includes approximately 28,500 members and is so large

11    that joinder of all its members is impracticable.

12         b.    There are questions of law and fact common to the proposed class, the

13    resolution of which will resolve the validity of all class members' claims, including whether

14    Defendants violated ERISA in connection with the transactions and, if so, the appropriate

15    remedy for any violation.

16         c.    Plaintiffs' claims are typical of the claims of the class because all Plaintiffs

17    and all class members were participants in the Plan and were subjected to Defendants'

18    conduct in transferring Weyerhaeuser's benefit payments to the Athene entities.

19         d.    Plaintiffs are adequate representatives of the proposed class because they

20    are committed to the vigorous representation of the class and prosecution of this action;

21    have engaged experienced and competent attorneys to represent the class; and have no

22    conflicts of interest with members of the proposed class.

23         e.    The claims herein satisfy the requirements of Rule 23(b)(1) because

24    prosecuting separate actions by individual class members would create a risk of (A)

1   inconsistent or varying adjudications that would establish incompatible standards of

2   conduct for Defendants with respect to their obligations to the Plan and members of the

3   proposed class and (B) adjudications by individual participants and beneficiaries regarding

4   these breaches of fiduciary duty and remedies for the Plan would, as a practical matter, be

5   dispositive of the interests of the participants and beneficiaries not party to the adjudication

6   or would substantially impair or impede those participants' and beneficiaries' ability to

7   protect their interests. Therefore, this action should be certified as a class action under Rule

8   23(b)(1)(A) or (B).

9       f.      The claims herein also satisfy the requirements of Rule 23(b)(2) because

10  Defendants acted or refused to act in the same manner generally to the class, so that final

11  injunctive or corresponding declaratory relief is appropriate respecting the class as a whole.

12      g.      Alternatively, the claims herein satisfy the requirements of Rule 23(b)(3)

13  because common questions of law and fact predominate over individual questions and a

14  class action is superior to individual actions or other methods of adjudication. Given the

15  nature of the allegations and Defendants' common course of conduct to the class as a whole,

16  no class member has an interest in individually controlling the prosecution of this matter,

17  and Plaintiffs are aware of no difficulties likely to be encountered in the management of

18  this matter as a class action.

19  134.    Plaintiffs' counsel, Schlichter Bogard LLP, will fairly and adequately represent the

20  interests of the class and is best able to represent the interests of the class under Rule 23(g). The

21  firm has extensive experience in the area of ERISA fiduciary breach litigation and has been

22  appointed class counsel in over 40 ERISA fiduciary breach actions since 2006. The firm is

23  recognized "as a pioneer and the leader in the field" of ERISA retirement plan litigation, *Abbott v.*

24  *Lockheed Martin Corp.*, No. 06-701, 2015 U.S. Dist. LEXIS 93206, at *4–5 (S.D. Ill. July 17,

COMPLAINT                          44                    Schlichter Bogard LLP
                                                        100 S. 4th Street, Ste. 1200
                                                        St. Louis, MO 63102

2015), and are "clearly experts in ERISA litigation." *Tussey v. ABB, Inc.*, No. 06-4305, 2012 U.S. Dist. LEXIS 157428 at 10 (W.D. Mo. Nov. 2, 2012). The firm's work in ERISA class actions has been featured in the New York Times, Wall Street Journal, NPR, Reuters, and Bloomberg, among other media outlets. *See, e.g.*, Anne Tergesen, *401(k) Fees, Already Low, Are Heading Lower*, WALL ST. J. (May 15, 2016); Gretchen Morgenson, *A Lone Ranger of the 401(k)'s*, N.Y. TIMES (Mar. 29, 2014); Liz Moyer, *High Court Spotlight Put on 401(k) Plans*, WALL ST. J. (Feb. 23, 2015); Floyd Norris, *What a 401(k) Plan Really Owes Employees*, N.Y. TIMES (Oct. 16, 2014); Sara Randazzo, *Plaintiffs' Lawyer Takes on Retirement Plans*, WALL ST. J. (Aug. 25, 2015); Jess Bravin and Liz Moyer, *High Court Ruling Adds Protections for Investors in 401(k) Plans*, WALL ST. J. (May 18, 2015); Jim Zarroli, *Lockheed Martin Case Puts 401(k) Plans on Trial*, NPR (Dec. 15, 2014); Mark Miller*, Are 401(k) Fees Too High? The High-Court May Have an Opinion*, REUTERS (May 1, 2014); Greg Stohr, *401(k) Fees at Issue as Court Takes Edison Worker Appeal*, BLOOMBERG (Oct. 2, 2014).

## COUNT I

### Breaches of Fiduciary Duty by All Defendants Regarding Athene

135.    Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

136.    Each Defendant acted as a "fiduciary" as defined by ERISA with respect to the Plan and transactions at issue.

137.    As such, Defendants were required to discharge their duties with respect to the Plan "solely in the interest of" and "for the exclusive purpose of providing benefits to" the Plan's participants and beneficiaries and defraying reasonable expenses of administering the Plan, and "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(A)–(B).

Schlichter Bogard LLP
100 S. 4th Street, Ste. 1200
St. Louis, MO 63102

138.    Interpretive Bulletin 95-1 sets forth the Department of Labor's view of the legal standard imposed by § 1104(a)(1)(A) and (B) as it relates to a fiduciary's selection of an annuity provider in connection with a pension risk transfer. 29 C.F.R. § 2509.95-1. Among other requirements, to fulfill the duties to act solely in the interest of participants and for the exclusive purpose of providing benefits, fiduciaries generally must take steps calculated to obtain "the safest annuity available." Fulfilling the duty of prudence requires an objective, thorough, and analytical search for an annuity provider. This is confirmed by case law adopting a materially similar standard and holding that the fiduciary must take steps to conduct a thorough and impartial investigation designed to identify and hire the provider that "best promotes participants' and beneficiaries' interests" in the security of their pensions, without regard to cost. *Bussian*, 223 F.3d at 302.

139.    Defendants breached their fiduciary obligations. Based on objective criteria, and relative to other providers in the market for plans of the character and size of the Plan, Athene was not the safest annuity available nor was it the provider that would best promote the interests of the transferees. On information and belief, Defendants selected Athene not because doing so was in the interest of participants, their beneficiaries, and the security of their retirement benefits, but because it advanced corporate interests by saving Weyerhaeuser money and enhanced corporate profits. State Street was conflicted, and its selection or recommendation of Athene was influenced by its relationships with Weyerhaeuser, Athene, and affiliates , as opposed to being the result of an objective and thorough independent investigation into the merits of whether Athene was the safest annuity provider available. In so doing, Defendants breached their duty of loyalty by favoring corporate interests over the participants' interests in a secure retirement. Because the Weyerhaeuser Defendants' goal and motivation was to save Weyerhaeuser money, and State Street's goal and motivation was to benefit itself and its corporate partner, they did not conduct a thorough investigation of alternatives and failed to adequately evaluate the many deficiencies they would

1    have discovered if they thoroughly evaluated Athene as a candidate, thereby breaching the duty of

2    prudence.

3        140.    The harm suffered by Plaintiffs and class members from these breaches of fiduciary

4    duty includes a decrease in value of their pension benefits due to uncompensated risk and an

5    increased and significant risk that they will not receive the benefit payments to which they are

6    entitled . Plaintiffs must also be compensated for the losses associated with the monetary value of

7    the additional risk of their Athene annuities as demonstrated by the marketplace.

8        141.    Defendants are subject to appropriate relief to remedy these breaches of fiduciary

9    duty, including, without limitation, disgorgement of all ill-gotten profits/cost savings realized by

10   Defendants by virtue of purchasing Athene annuities instead of an ERISA-compliant annuity and

11   the posting of security to assure receipt by Plaintiffs and class members of their full retirement

12   benefits, plus prejudgment interest. *See* 29 U.S.C. §§ 1109(a), 1132(a)(2), 1132(a)(3), 1132(a)(9).

13       142.    Based on the facts alleged herein, each Defendant is also liable for the breaches of

14   its co-fiduciaries under 29 U.S.C. § 1105(a) because the alleged facts show that each Defendant

15   knowingly participated in the breach of the other Defendants; knowing that such acts were a

16   breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own

17   fiduciary duties; and/or knew of the breach by the other Defendants and failed to make any

18   reasonable effort under the circumstances to remedy the breach.

19                                    **COUNT II**

20                **Non-Fiduciary Knowing Participation in ERISA Violations**

21       143.    Plaintiffs restate and incorporate the allegations contained in the preceding

22   paragraphs.

23       144.    Under 29 U.S.C. § 1132(a)(3), a court may award appropriate equitable relief to

24   redress violations of ERISA. While certain ERISA provisions impose liability on fiduciaries only,

§ 1132(a)(3) "admits of no limit . . . on the universe of possible defendants." *Harris Tr.*, 530 U.S. at 246.

145.    Section § 1132(a)(9) allows a court to order appropriate relief to remedy a PRT that violates ERISA, and also admits of no limit on the universe of possible defendants.

146.    If any of the Defendants did not act as fiduciaries with respect to the selection of Athene, then in the alternative to Count I, such defendants are liable under §§ 1132(a)(3) and 1132(a)(9) for knowing participation in ERISA violations by the fiduciaries who selected Athene. Each of these Defendants knew of the circumstances that rendered the responsible fiduciary's conduct a breach of fiduciary duties or prohibited transaction. These Defendants knew that the responsible fiduciary's investigation of available annuity providers was neither objective nor sufficiently thorough. They also knew that the deficient selection of Athene instead of a prudent alternative annuity provider would generate a massive corporate benefit for Weyerhaeuser and then knowingly accepted that benefit. And they knew that the purchase of Athene annuities involved facts constituting transactions prohibited by § 1106.

## COUNT III

### Prohibited Transactions

147.    Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

148.    ERISA supplements the general fiduciary duties by categorically prohibiting certain transactions. 29 U.S.C. § 1106(a)(1), (b).

149.    Section 1106(a) prohibits various transactions between a plan and a "party in interest," which Congress defined to encompass "those entities that a fiduciary might be inclined to favor at the expense of the plan beneficiaries," *Harris Tr. & Sav. Bank*, 530 U.S. at 242, such as employers, other fiduciaries, and service providers. 29 U.S.C. § 1002(14)(A)–(C).

150.    Section 1106(b) categorically prohibits a fiduciary from engaging in certain transactions with a plan, which often involve self-dealing.

151.    Athene was a party in interest because it provided services to the Plan. 29 U.S.C. § 1002(14)(B). Defendants knowingly caused the Plan to engage in the transactions with Athene with actual or constructive knowledge that the transactions constituted direct or indirect (i) exchanges of property between the Plan and Athene; (ii) furnishing of services between the Plan and Athene; and (iii) transfers to, or uses by or for the benefit of Athene, of Plan assets. *See* 29 U.S.C. § 1106(a)(1)(A), (C), (D).

152.    The transactions at issue do not qualify for any exemption from the prohibitions of § 1106(a). Among other reasons, given the substantial risk that Athene's retention posed to participants' retirement benefits, Athene received more than reasonable compensation for its services to the Plan.

153.    By using pension trust assets to purchase Athene annuities instead of the safest available annuity so as to increase Weyerhaeuser's corporate profits, Defendants dealt with the assets of the Plan in their own interest or for their own account and acted on behalf of a party (Weyerhaeuser) whose interest in using a riskier, lower-cost annuity provider was adverse to the interests of the Plan's participants and their beneficiaries in obtaining the safest available annuity. 29 U.S.C. § 1106(b)(1)–(2).

154.    Each Defendant is subject to appropriate relief to remedy these prohibited transactions, including disgorgement of all ill-gotten profits/cost savings realized by Weyerhaeuser by virtue of purchasing, selecting, or recommending Athene annuities instead of an ERISA-compliant annuity and the posting of security to assure receipt by Plaintiffs and class members of their full retirement benefits, plus prejudgment interest. *See* 29 U.S.C. §§ 1109(a), 1132(a)(2), 1132(a)(3), 1132(a)(9).

155.    Each Defendant knowingly participated in the breach of the other Defendants; knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties; and/or knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

156.    Even if the Weyerhaeuser Defendants did not act as fiduciaries over the selection of Athene in the PRT transaction, they are still liable as nonfiduciary parties-in-interest who knowingly participated in a prohibited transaction committed by another fiduciary. A nonfiduciary transferee of ill-gotten proceeds is subject to appropriate equitable relief if it had actual or constructive knowledge of the circumstances that rendered the transaction unlawful. The Weyerhaeuser Defendants had actual or constructive knowledge that the Plan's PRT transaction with Athene was unlawful and thus knew or should have known that the other fiduciary was engaged in an unlawful transaction by causing the Plan to transfer billions of dollars of pension obligations to Athene.

## COUNT IV

### Failure to Monitor Fiduciaries

157.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

158.    The Weyerhaeuser Defendants' fiduciary responsibility for overseeing the Plan included monitoring any other fiduciaries appointed or hired to manage the Plan, including State Street.

159.    A monitoring fiduciary must ensure that those to whom its fiduciary duties are delegated are performing their delegated duties in compliance with ERISA's fiduciary standards.

The Weyerhaeuser Defendants breached their fiduciary monitoring duties by failing to ensure that the process of selecting Athene as an annuity provider complied with the fiduciary standards set forth in 29 U.S.C. §§ 1104(a)(1)(A)–(B), 1132(a)(9), and 29 C.F.R. § 2509.95-1.

160.    Had the Weyerhaeuser Defendants fulfilled their fiduciary monitoring duties, Athene would have been rejected in favor of the safest available annuity or Defendants would have decided that it was not possible to proceed with the transaction consistent with ERISA's fiduciary standards. As a result of these monitoring failures, Plaintiffs and class members suffered harm, including a decrease in value of their pension benefits due to uncompensated risk and an increased and significant risk that they will not receive the benefit payments to which they are entitled.

## JURY TRIAL DEMANDED

161.    Pursuant to FED. R. CIV. P. 38 and the Seventh Amendment to the United States Constitution, Plaintiffs demand a trial by jury on all issues so triable in this action and, alternatively, an advisory jury.

## PRAYER FOR RELIEF

Based on the foregoing, Plaintiffs, on behalf of the proposed class of similarly situated Plan participants and beneficiaries, respectfully request that the Court:

- Find and declare Defendants have breached their fiduciary duties and caused the prohibited transactions described above;

- Order disgorgement of all sums derived from the improper transaction;

- Order Defendants to post adequate security to assure receipt by Plaintiffs and class members of all retirement benefits covered by Athene annuities, plus prejudgment interest;

- Certify the proposed class, appoint each Plaintiff as a class representative, and appoint Schlichter Bogard LLP as Class Counsel;

COMPLAINT                                   51                        Schlichter Bogard LLP
                                                                     100 S. 4th Street, Ste. 1200
                                                                     St. Louis, MO 63102

- Award to the Plaintiffs and the class their attorney's fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;
- Order the payment of interest to the extent it is allowed by law; and
- Grant any other relief as the Court deems appropriate to remedy the ERISA violations.

December 12, 2024

Respectfully submitted,

SCHLICHTER BOGARD LLP

By: /s/ *Jerome Schlichter*
Jerome J. Schlichter*
Sean E. Soyars*
Kurt C. Struckhoff*
Patrick R. Kutz*
Terrence W. Scudieri, Jr.*
100 South Fourth Street, Suite 1200
St. Louis, Missouri 63102
Telephone: +1 (314) 621-6115
Facsimile: +1 (314) 621-5934
jschlichter@uselaws.com
ssoyars@uselaws.com
kstruckhoff@uselaws.com
pkutz@uselaws.com
tscudieri@uselaws.com

*Applications for admission *pro hac vice* forthcoming

LAW OFFICE OF CARL J. MARQUARDT, PLLC

By: /s/ *Carl J. Marquardt*
Carl J. Marquardt (WSBA #23257)
1126 34th Avenue, Suite 311
Seattle, WA 98122
Tel. 206-388-4498
e-mail: carl@cjmpllc.com

*Attorneys for Plaintiffs & the Proposed Class*