UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| GREGORY MANEMAN et al., | CASE NO. C24-2050-KKE |
| Plaintiff(s), | ORDER GRANTING MOTIONS TO DISMISS |
| v. | |
| WEYERHAUSER COMPANY et al., | |
| Defendant(s). | |

Plaintiffs, former employees of Defendant Weyerhaeuser Company ("Weyerhaeuser"), filed this putative class action against Weyerhaeuser, two affiliated entities, and State Street Global Advisors Trust Company ("SSGA") for alleged violations of the Employee Retirement Income Security Act ("ERISA"). This case arises out of a transaction in which Weyerhaeuser terminated Plaintiffs and other similarly situated retirees from its employer-sponsored pension plan and purchased annuities from Athene Annuity and Life Co.[1] ("Athene"). The annuities guaranteed fixed, monthly payments to Plaintiffs—effectively resulting in Athene assuming Weyerhaeuser's obligation to pay Plaintiffs' retirement benefits going forward. ERISA generally permits such transactions. But it obligates plan fiduciaries to behave prudently and in the sole interests of plan

---

[1] The Amended Complaint states that Weyerhaeuser transferred its pension obligations to "either Athene Annuity and Life Co. or Athene Annuity & Life Assurance Company of New York" and refers to these two companies interchangeably. Dkt. No. 62 ¶ 3. Defendants do not contend that any distinction between these companies is relevant to the present motions, so the Court will follow suit and refer to the Athene insurers collectively as simply "Athene."

ORDER GRANTING MOTIONS TO DISMISS - 1

beneficiaries when it comes to selecting an annuity provider to take over the employer's pension obligations.

Plaintiffs allege that Defendants violated these duties and engaged in categorically prohibited transactions by selecting a cheaper, riskier annuity provider—i.e., Athene—in order to save money for Weyerhaeuser. According to Plaintiffs, Athene engages in a high-risk, high-reward investment strategy that allows it to charge employers a lower premium but offers no benefits to retirees who do not stand to gain from the upside of Athene's investments.

Defendants moved to the dismiss this lawsuit on two grounds. First, they contend that Plaintiffs lack standing to sue because, among other reasons, Plaintiffs have continued receiving their regular benefit payments from Athene, which, according to Defendants, is all Plaintiffs are entitled to. Second, Defendants argue that Plaintiffs fail to plead facts plausibly supporting a breach of fiduciary duty or a prohibited transaction claim under ERISA.

Though, as discussed in detail below, the question is a close one, the Court concludes that Plaintiffs have adequately pleaded standing. Plaintiffs claim that, as a result of Defendants' actions, they received a less safe—and, thus, less valuable—annuity than they would have received had Defendants complied with their duties under ERISA. The receipt of a less valuable annuity is a concrete injury, giving Plaintiffs a sufficient stake in the outcome of this case to invoke the Court's jurisdiction. However, the Court agrees that Plaintiffs' factual allegations fail to state an ERISA violation. Plaintiffs' allegations concerning Athene's financial condition almost entirely postdate the transaction at issue and thus have little bearing on whether Defendants complied with their fiduciary duties in selecting Athene. Accordingly, and for the reasons that follow, the Court will grant Defendants' motions.

## I.    BACKGROUND[2]

**A.    ERISA and Pension Risk Transfers**

The Court begins by reviewing the legal context in which this case arises.  Broadly speaking, ERISA protects the security of American workers' retirement benefits by requiring, among other things, that employer-sponsored pension plan assets be held in trust, 29 U.S.C. § 1103(a), and that fiduciaries abide by certain standards of conduct when managing plan assets, *id.* § 1104(a).  In particular, ERISA imposes fiduciary duties of loyalty and prudence on those tasked with managing and safeguarding ERISA-covered pensions.  Thus, ERISA requires fiduciaries to "discharge [their] duties with respect to a plan solely in the interest of the [plan] participants and beneficiaries." *Id.*

Pension plans typically take one of two forms: defined contribution plans and defined benefit plans.  A defined contribution plan, such as a 401(k), provides each participant an individual account from which benefits are paid based on the value of the account, which can turn not only on the amounts contributed but also "on the plan fiduciaries' particular investment decisions." *Thole v. U. S. Bank N.A.*, 590 U.S. 538, 540 (2020); *see also* 29 U.S.C. § 1002(34).  By contrast, in a defined benefit plan—like the Weyerhaeuser plan at issue here—"retirees receive a fixed payment each month, and the payments do not fluctuate with the value of the plan or because of the plan fiduciaries' good or bad investment decisions." *Thole*, 590 U.S. at 540.  In the context of defined benefit plans, employers' liabilities are fixed, so the employer "receives any surplus left over after all of the benefits are paid" and, conversely, "is on the hook for plan shortfalls." *Id.* at 543.

---

[2] The following facts are taken from the allegations in the Amended Complaint and are assumed true for the purpose of resolving these motions.  Because the Court finds Plaintiffs' claims should be dismissed on the pleadings alone, the Court declines Defendants' request to take judicial notice of various facts and records. *See* Dkt. No. 67 at 9 n.4.

ORDER GRANTING MOTIONS TO DISMISS - 3

ERISA-covered plans are typically protected by a federal entity called the Pension Benefit Guaranty Corporation ("PBGC"), which assumes the obligation to pay retirees' benefits in the event their employer or plan sponsor becomes insolvent.  Dkt. No. 62 ¶¶ 42–43.  To provide this backstop, the PBGC charges premiums to ERISA-governed pension plans.  *Id.* ¶ 43.

ERISA permits an employer-sponsor to terminate a defined benefit pension plan by purchasing a replacement annuity to cover ongoing pension obligations.  29 U.S.C. § 1341(b)(3)(A)(i).  Such a transaction is called a pension risk transfer, or "PRT," which is a category of transactions in which the employer-sponsor transfers the risk entailed in providing ongoing benefits to a third party—in this case, an annuity provider.  Dkt. No. 62 ¶ 39.  A PRT transaction can involve either a "total buyout," in which the employer-sponsor terminates the plan entirely and transfers all its pension obligations to a third party, or—as was the case here—a "partial buyout," in which the employer-sponsor terminates a select group of plan participants and purchases annuities or other assets to satisfy only those participants' benefits.  *Id.* ¶ 41.  Under ERISA, an employer's decision to terminate a plan and engage in a PRT transaction is a business—or "settlor"—decision to which ERISA's fiduciaries duties do not attach.  *Beck v. PACE Int'l Union*, 551 U.S. 96, 101–02 (2007).  However, the *selection* of an annuity provider in a PRT transaction is a fiduciary function that must be performed consistent with the duties of loyalty and prudence.  *See Pilkington PLC v. Perelman*, 72 F.3d 1396, 1401–02 (9th Cir. 1995) (holding employer's choice of annuity provider for pension plan post-termination was subject to ERISA's fiduciary duties).

To illustrate the risk of choosing an annuity provider poorly, Plaintiffs point to the collapse of Executive Life Insurance Company in 1991, which impacted the benefits of over 300,000 policyholders, including tens of thousands of retirees whose pensions had been swapped for Executive Life annuities.  Dkt. No. 62 ¶¶ 45–51; *see also Bussian v. RJR Nabisco, Inc.*, 223 F.3d

ORDER GRANTING MOTIONS TO DISMISS - 4

286, 292–93 (5th Cir. 2000) (describing Executive Life's failure and its impact on retirees). Congress responded to Executive Life's collapse by "pass[ing] the Pension Annuitants Protection Act of 1994" ("PAPA") which amended ERISA to create an express cause of action for plan participants and beneficiaries who are ejected from an ERISA-covered plan through a PRT transaction. Dkt. No. 62 ¶ 52. This provision states, as relevant, "in the event that the purchase of an … insurance annuity in connection with termination of an individual's status as a participant covered under a pension plan … constitutes a violation of" ERISA, anyone who was "a participant or beneficiary at the time of the alleged violation" can sue for "appropriate relief, including the posting of security … to assure receipt" of their benefits, plus prejudgment interest. 29 U.S.C. § 1132(a)(9).

The year after Congress passed this amendment, the U.S. Department of Labor issued Interpretive Bulletin 95-1 ("IB 95-1"), which provides guidance on the Department's interpretation of ERISA's fiduciary requirements concerning the selection of an annuity provider in a PRT transaction. 29 C.F.R. § 2509.95-1; Dkt. No. 62 ¶ 54. IB 95-1 states that, in selecting an annuity provider, "fiduciaries … must take steps calculated to obtain the safest annuity available, unless under the circumstances it would be in the interests of participants and beneficiaries to do otherwise." 29 C.F.R. § 2509.95-1(c). The guidance sets out a nonexclusive list of six factors fiduciaries should consider when undertaking this process:

> (1) The quality and diversification of the annuity provider's investment portfolio;
>
> (2) The size of the insurer relative to the proposed contract;
>
> (3) The level of the insurer's capital and surplus;
>
> (4) The lines of business of the annuity provider and other indications of an insurer's exposure to liability;
>
> (5) The structure of the annuity contract and guarantees supporting the annuities, such as the use of separate accounts; [and]

ORDER GRANTING MOTIONS TO DISMISS - 5

> (6) The availability of additional protection through state guaranty associations and the extent of their guarantees. Unless they possess the necessary expertise to evaluate such factors, fiduciaries would need to obtain the advice of a qualified, independent expert. A fiduciary may conclude, after conducting an appropriate search, that more than one annuity provider is able to offer the safest annuity available.

*Id.*

## B.    Factual Background

Weyerhaeuser is a timberland company with headquarters in Seattle that owns, controls, or manages over 24 million acres of timberlands in the United States and Canada. Dkt. No. 62 ¶ 26. Weyerhaeuser is the sponsor of the Weyerhaeuser Pension Plan (the "Plan"), a defined benefit plan providing pension benefits for retired employees of Weyerhaeuser and its affiliated companies. *Id.* ¶¶ 18–19, 28. Plaintiffs also sue the Weyerhaeuser Company Annuity Committee and the Weyerhaeuser Company Administrative Committee (together with Weyerhaeuser, the "Weyerhaeuser Defendants"), each of which allegedly served as fiduciaries and exercised discretionary control respecting the transaction at issue in this case. *Id.* ¶¶ 29–30. Plaintiffs Gregory Maneman, Annette Williams, Cassandra Wright, James Hollins, and Pierre Donaby are former Weyerhaeuser employees who were participants of the Plan until Athene assumed the obligation to pay their benefits. *Id.* ¶¶ 21–25.

In January 2019, Weyerhaeuser entered into an agreement to transfer $1.5 billion of the Plan's pension obligations to Athene via a PRT transaction. *Id.* ¶ 3. As part of the transaction, the Weyerhaeuser Defendants purchased group annuity contracts from Athene on behalf of some of Weyerhaeuser's former employees. *Id.* ¶ 28. The transaction affected approximately 28,500 U.S.-based Weyerhaeuser retirees and their beneficiaries, representing over 52% of the Plan's participants. *Id.* ¶ 3. The Weyerhaeuser Defendants themselves, however, did not select Athene. Rather, Plaintiffs allege that the Weyerhaeuser Company Annuity Committee appointed, and that

Weyerhaeuser hired, SSGA "as an independent fiduciary to the Plan" tasked with "select[ing] an annuity provider in compliance with [IB 95-1]." *Id.* ¶¶ 29, 31, 131.

Plaintiffs allege that Defendants failed to undertake a process reasonably calculated to obtain "the safest annuity available," and instead selected Athene, which they claim "is substantially riskier than numerous traditional annuity providers." *Id.* ¶¶ 4–5. According to Plaintiffs, "[a]nnuities issued by Athene are structured to generate higher expected returns and profits for Athene and its affiliates by investing in lower-quality, higher-risk assets without the traditional mix of quality assets to support future benefit obligations." *Id.* ¶ 5. Because policyholders like Plaintiffs are entitled only to fixed monthly payments, they "do not share in the potential upside of these high-risk strategies but bear the downside risk that losses will impair Athene's ability to pay their Weyerhaeuser pensions." *Id.* Plaintiffs point to a litany of risk factors they claim raise concerns about Athene's creditworthiness compared to other annuity providers. *Id.* ¶¶ 61–124. To name just a few, they allege that Athene lacks a sufficient track record to guarantee its pension liabilities; is heavily invested in risky asset-backed securities and leveraged loans compared to other insurers; has a lower credit rating than other insurers; relies heavily on affiliated reinsurance companies based in Bermuda, where capital and transparency requirements are laxer; has a smaller surplus-to-liability ratio than comparable annuity providers; has experienced a relatively high growth in liabilities in recent years; and shares a number of similarities with recently failed insurers, including engagement in certain high-risk practices. *Id.*

Plaintiffs allege, "on information and belief," that Defendants selected Athene, not because it was the best choice for pensioners, but because it offered a lower premium "relative to the cost of a safe annuity from an established and reputable insurance provider, such as New York Life." *Id.* ¶ 145. Plaintiffs further contend that SSGA was motivated to select Athene because it understood that a lower cost annuity was in the interests of its client, Weyerhaeuser, and because

ORDER GRANTING MOTIONS TO DISMISS - 7

SSGA's parent company is a significant shareholder in both Weyerhaeuser and Apollo—Athene's current parent company. *Id.* ¶¶ 125–29. Even if Athene did not offer the lowest premium, Plaintiffs allege that "no prudent fiduciary would" have "opt[ed] for a riskier annuity if a safer annuity was available for the same price." *Id.* ¶ 146.

## C.    Procedural History

Plaintiffs filed their original class action complaint on December 12, 2024. Dkt. No. 1. Following briefing on motions to dismiss (*see* Dkt. Nos. 32, 33, 49), the Court granted Plaintiffs leave to file an amended complaint, which Plaintiffs did in May 2025 (Dkt. Nos. 61, 62, 63). Defendants again moved to dismiss the Amended Complaint, and the parties fully briefed the motions. Dkt. Nos. 66, 67, 74, 78, 79. The Court also granted motions for leave to file *amicus curiae* briefs by the American Council of Life Insurers (Dkt. Nos. 69, 70); the Pension Rights Center (Dkt. Nos. 75, 76); and an industry coalition including the ERISA Industry Committee, the American Benefits Council, and the Committee on Investment of Employee Benefit Assets Inc. (Dkt. Nos. 71, 72). The Court heard oral argument on January 8, 2026 (Dkt. No. 85), and the motions to dismiss are now ripe.

## II.   DISCUSSION

## A.    Article III Standing

Defendants contend that Plaintiffs lack Article III standing. This is so, they claim, because as (former) participants in a defined benefit pension plan, Plaintiffs' only entitlement is to their fixed monthly payments, which they have continued to receive from Athene following the PRT transaction. District courts across the country adjudicating nearly identical cases have reached different conclusions on this threshold issue, and the appellate courts have yet to squarely weigh in. While recognizing the question is a close one, at this stage, this Court finds that Plaintiffs have adequately pleaded their standing to sue.

To invoke the Court's jurisdiction under Article III of the Constitution, a "plaintiff must have a 'personal stake' in the case—in other words, standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (quoting *Raines v. Byrd*, 521 U.S. 811, 819 (1997)). Standing requirements "can neither be waived by the parties nor ignored by the court[.]" *Yakima Valley Mem'l Hosp. v. Wash. State Dep't of Health*, 654 F.3d 919, 932 n.17 (9th Cir. 2011). And when standing is in dispute, "[t]he burden of showing that there is standing rests on the shoulders of the party asserting it." *Smelt v. Cnty. of Orange*, 447 F.3d 673, 682 (9th Cir. 2006) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). A plaintiff carries this burden by showing an injury-in-fact that is fairly traceable to the challenged action of the defendants and likely to be redressed by a favorable decision. *Cal. Sea Urchin Comm'n v. Bean*, 883 F.3d 1173, 1180 (9th Cir. 2018), *as amended* (Apr. 18, 2018) (citing *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)).

Defendants challenge Plaintiffs' standing on two grounds. They contend, first, that Plaintiffs fail to establish an injury-in-fact and, second, that, even assuming a cognizable injury, any such injury is not traceable to the Weyerhaeuser Defendants. The Court considers each argument below.

1. Injury-in-fact

To establish an injury-in-fact, a plaintiff must demonstrate "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016), *as revised* (May 24, 2016) (quoting *Lujan*, 504 U.S. at 560). Importantly, "Article III standing requires a concrete injury even in the context of a statutory violation." *Id.* at 341. "Allegations of possible future injury" alone are insufficient. *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990). A future injury must be imminent, and while "imminence is concededly a somewhat elastic concept, it cannot be stretched

ORDER GRANTING MOTIONS TO DISMISS - 9

beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes[.]" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Lujan*, 504 U.S. at 565 n.2). "[T]raditional tangible harms," on the other hand, such as present "physical" or "monetary" harms, "readily qualify as concrete injuries under Article III" and are always sufficient to establish a cognizable injury-in-fact. *TransUnion*, 594 U.S. at 425.

Plaintiffs allege injury under three different theories. First, they contend that selecting an annuity from a riskier insurance company left Plaintiffs with a less valuable annuity than they would have received had Defendants fulfilled their fiduciary obligations—thus inflicting, essentially, a present pocketbook harm. Second, Plaintiffs claim that a breach of fiduciary duty itself represents a "harm that 'traditionally' provided 'a basis for a lawsuit in American courts' and [therefore] satisfies Article III"—even *without* a tangible economic harm. Dkt. No. 74 at 31 (quoting *TransUnion*, 594 U.S. at 424). Third, Plaintiffs argue that their operative complaint alleges sufficient facts to establish a "substantial risk" that Athene's financial condition will degrade in the future to the point that Plaintiffs will not receive, or will suffer an interruption or delay in, their benefits.

Before considering these arguments, it is helpful to clarify the scope of the Court's injury-in-fact inquiry in the context of a PRT transaction. As mentioned, and as Plaintiffs acknowledge in their Amended Complaint, the decision to terminate a pension plan via a PRT transaction is a settlor function not subject to ERISA's fiduciary obligations. Dkt. No. 62 ¶ 4 ("[A]n employer's decision to transfer pension obligations to an insurance company is considered a business decision not subject to fiduciary standards[.]"). Indeed, ERISA expressly permits—and, in some cases, requires—the purchase of annuities when an employer terminates a pension plan. *See* 29 U.S.C. § 1341(b)(3)(A) (requiring a plan administrator, upon a "standard termination of the plan under this subsection," to "purchase irrevocable commitments from an insurer to provide all benefit

ORDER GRANTING MOTIONS TO DISMISS - 10

liabilities under the plan" or "otherwise fully provide all" such benefits); *Beck*, 551 U.S. at 99 (noting that the "purchase of annuities" is "one statutorily specified method of plan termination" under ERISA).  Accordingly, any cognizable injury must stem from the decision to select Athene as Plaintiffs' annuity provider, not from the plan termination itself.  Put another way, "any loss of ERISA protections as a result of a PRT cannot be considered to be a legal injury because ERISA explicitly permits employers to terminate their pension plans through a PRT." *Bueno v. Gen. Elec. Co.*, No. 24-CV-0822, 2025 WL 2719995, at *10 (N.D.N.Y. Sep. 24, 2025).

This context narrows the Court's inquiry considerably.  Practically speaking, Plaintiffs have suffered a number of harms as a result of being transferred out of the Weyerhaeuser Plan.  For instance, they no longer have a federal cause of action under ERISA to sue their new annuity provider for breach of fiduciary duty.  *See Hallingby v. Hallingby*, 574 F.3d 51, 56 (2d Cir. 2009) (holding that termination of employee-sponsored plan and purchase of annuities "formally severed the applicability of ERISA" such that plaintiff's claims had to "be resolved on the basis of state-law principles" (citation modified)).  Plaintiffs' benefits are also no longer guaranteed by the PBGC and are instead now guaranteed to lower levels by state guaranty associations ("SGAs"), allegedly up to a typical cap of $250,000 per beneficiary.  Dkt. No. 62 ¶ 44.  And Plaintiffs no longer enjoy the protection of the Department of Labor, which is authorized to enforce ERISA's fiduciary obligations (and motivated to "aggressively" do so since the federal government bears "the financial burden of failed defined-benefit plans[,]" *Thole*, 590 U.S. at 545).  *See* 29 U.S.C. § 1132(a).  None of these harms, however, support Plaintiffs' standing to sue because only "an invasion of a legally protected interest" can constitute a cognizable injury; and ERISA does not impose fiduciary duties on an employer's decision to terminate a covered plan and transfer its liabilities to an annuity provider.  *Spokeo,* 578 U.S. at 339; *see also Beck*, 551 U.S. at 101 ("It is well established … that an employer's decision whether to terminate an ERISA plan is a settlor

function immune from ERISA's fiduciary obligations.").

With this limit in mind, the Court nevertheless concludes that Plaintiffs have alleged an Article III injury-in-fact, wholly separate from their ejection from the plan, that flows from the selection of Athene as the PRT annuity provider. Their basic claim is that Defendants had a fiduciary obligation to take steps to identify and select a suitably safe annuity on behalf of pensioners, but instead purchased a cheaper, unsafe annuity to maximize Weyerhaeuser's reversion of excess plan assets following the transfer. As a result, Plaintiffs claim they suffered a present, concrete injury in the form of a riskier—and, thus, less valuable—annuity than they would have received had Defendants met their fiduciary obligations. And Plaintiffs backed up this claim with factual allegations—which, at this stage, the Court accepts as true—comparing Athene unfavorably to other insurers in terms of its low surplus-to-liability ratio, its high growth rate in liabilities, its heavy reliance on affiliated reinsurance in lax regulatory jurisdictions, and its degree of investment in risky asset-backed securities and leveraged loans, among other factors. *See* Dkt. No. 62 ¶¶ 68–76.

Setting aside, for the moment, any difficulty in putting a price on Plaintiffs' annuities, their alleged diminution in value is a traditional, "monetary harm[]" that "readily" qualifies as a concrete injury under Article III. *TransUnion*, 594 U.S. at 425. In exchange for years of service at Weyerhaeuser, Plaintiffs received contractual rights to defined retirement benefits, which—upon termination of the plan—were converted into group annuity contracts. Such contracts are a type of property. *See Lynch v. United States*, 292 U.S. 571, 579 (1934) ("Valid contracts are property …."); *Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv.*, 707 F.2d 548, 554 (D.C. Cir. 1983) (recognizing a "property interest" in retirement benefits to the extent retirees were "legitimately entitled to benefits at that level"). And alleging "a reduction in the value of property" is typically "sufficient to demonstrate injury-in-fact at the pleading stage." *Barnum Timber Co. v.*

ORDER GRANTING MOTIONS TO DISMISS - 12

*U.S. E.P.A.*, 633 F.3d 894, 898 (9th Cir. 2011); *see also McGee v. S-L Snacks Nat'l*, 982 F.3d 700, 705–06 (9th Cir. 2020) ("Under the benefit of the bargain theory, a plaintiff might successfully plead an economic injury by alleging that she bargained for a product worth a given value but received a product worth less than that value." (citation modified)).  Plaintiffs allege that, as a result of the Defendants' fiduciary breach, they received annuities worth less than they would have had Defendants taken steps to obtain a suitably safe annuity.  At this stage, that suffices to show a present, economic injury for purposes of Article III standing.

Defendants resist Plaintiffs' diminution-in-value theory on two grounds.  First, they contend that the U.S. Supreme Court's decision in *Thole v. U. S. Bank N.A*, 590 U.S. 538 (2020) forecloses standing on this basis.  Second, they suggest that receiving a less valuable annuity could not have harmed Plaintiffs because they have no right to "assign or alienate" their annuities and thus no interest in the annuities' present value.  Dkt. No. 66 at 20.  The Court considers each argument in turn.

a.      *Thole v. U.S. Bank N.A.*

In *Thole*, retired employees of U.S. Bank sued various fiduciaries of the company's pension plans claiming the defendants had mismanaged plan assets by making what plaintiffs considered to be poor investments.  590 U.S. at 540–41.  As in this case, the retirees in *Thole* had been enrolled in a defined benefit plan, so their pension benefits did "not fluctuate with the value of the plan or because of the plan fiduciaries' good or bad investment decisions." *Id.* at 540.  With this distinction in mind, the Court held that the retirees had suffered no cognizable injury from the alleged mismanagement because they had "received all of their monthly benefits payments so far" and would "receive the exact same monthly benefits that they [were] already slated to receive" regardless of the outcome of the suit. *Id.* at 541.

Defendants contend that *Thole* forecloses Plaintiffs' diminution-in-value theory by

demonstrating that Plaintiffs have no legally protected interest in the present value of their annuities. Dkt. No. 66 at 20. This is so, they claim, because *Thole* held that a participant in a defined benefit plan is only entitled to their fixed future payments, which, in this case, Athene has continued paying. *Id.* Thus, such participants could only sue their employer for selecting an unreliable annuity provider if the provider either failed to make payments or was teetering on the brink of collapse, such that an interruption in payments was "certainly impending." *Id.* at 22 (quoting *Clapper*, 568 U.S. at 409).

Defendants' argument stretches *Thole* beyond its holding. Unlike this case, *Thole* involved allegations of mismanagement that simply imposed no material risks on pensioners. As the Court made clear, it was the employer in *Thole*, U.S. Bank, that bore the risk of its own bad investment decisions because, in a defined benefit plan, "the employer … is on the hook for plan shortfalls[.]" 590 U.S. at 543. If the plan's investments lost money, retirees would still receive their full benefits. Only if the losses became "so egregious" that not just the plan, but also U.S. Bank itself, failed and became unable to pay might the retirees be put at risk. *Id.* at 546. Critically, the retirees did not (and could not) allege that the mismanagement in that case "substantially increased the risk" that such a catastrophic failure would happen. *Id.* And even if they had, the Court noted that the PBGC would act as a backstop, guaranteeing "benefits up to a certain amount" such that "plan participants whose benefits are guaranteed in full by the PBGC" would still be unlikely to establish an injury-in-fact. *Id.* at 546 n.2.

By contrast, in a PRT transaction where the challenged fiduciary decision is the selection of an annuity provider, the risk of a bad decision—selecting an unreliable provider—falls squarely on pensioners who stand to lose their benefits if the new provider fails. Put differently, when an employer selects a cheaper, riskier annuity, pensioners enjoy none of the upside (the cost savings) but bear all of the downside (the risk of default). That is virtually the reverse of *Thole*, where

ORDER GRANTING MOTIONS TO DISMISS - 14

retirees bore neither the upside nor the downside risk of their employer's investment decisions. *Id.* at 543.

Defendants seize on language in *Thole* observing that, whether the plaintiffs in that case won or lost, they would "receive the exact same monthly benefits that they [were] already slated to receive, not a penny less." *Id.* at 542; *see* Dkt. No. 66 at 19. As Defendants note, this case shares the superficial similarity that a decision in Plaintiffs' favor would not entitle them to any greater retirement benefits than they are already receiving. But unlike in *Thole*, Plaintiffs allege that Defendants' breach made them concretely worse off. They claim that Defendants' deficient selection process left them with a promise-to-pay from a less reliable provider than Defendants would have selected had they complied with ERISA. As another court recently explained in a similar PRT lawsuit, "[p]lainly [the substitution of different payors] can make a big difference. Consider an I.O.U. from a reputable bank and an I.O.U. from one's impecunious cousin. Ostensibly both 'legally and contractually entitle' the holder to the same future stream of payments, but the bank's is obviously more valuable than the other." *Piercy v. AT&T*, No. 24-CV-10608, 2025 WL 2505660, at *7 (D. Mass. Aug. 29, 2025), *R. & R. adopted*, 2025 WL 2809008 (D. Mass. Sept. 30, 2025). *Thole* did not involve the substitution of one payor for another; but *Thole*'s logic—that retirees lack standing to challenge mismanagement that does not affect them—does not suggest that Plaintiffs lack standing here.[3]

---

[3] Addressing standing in another PRT lawsuit, the district court in *Camire v. Alcoa USA Corp.* found that *Thole* forecloses the diminution-in-value theory of injury. No. CV 24-1062 (LLA), 2025 WL 947526, at *3–4 (D.D.C. Mar. 28, 2025). That court relied on *Thole*'s holding that the U.S. Bank retirees could not establish standing by alleging a loss to "the overall value of their plan" because the retirees remained entitled to monthly benefits "regardless of the plan's value at any one moment[.]" *Id.* at *4 (quoting *Thole*, 590 U.S. at 540). The district court reasoned that, since the plaintiffs before it had likewise continued to receive benefits from their new annuity provider, any diminution in the "value of their benefits" could not support standing. *Id.* at *3–4. But in this case, Plaintiffs' theory of injury is not based on the diminution in value of the plan's assets (which, *Thole* makes clear, participants have "no equitable or property interest in") but of *their annuities*. *Thole*, 590 U.S. at 543. There is no dispute that Plaintiffs have a "legally protected interest" in receiving their "fixed monthly payment[s]." Dkt. No. 89 at 15–16. It is the decline in value of *that* interest—not of the underlying plan assets—that supports standing here.

ORDER GRANTING MOTIONS TO DISMISS - 15

Moreover, Plaintiffs stand to gain something from this suit. If they win, PAPA entitles them to "appropriate relief," such as "the posting of security" to guaranty their receipt of annuity payments in the event of Athene's collapse. 29 U.S.C. § 1132(a)(9). That gives Plaintiffs a concrete stake in this case that the plaintiffs in *Thole* lacked.

b.     *Right to assign or alienate the annuities*

Next, Defendants argue that any "change in the hypothetical market value of [Plaintiffs'] annuities" does not harm them because they have no right to "assign or alienate" the annuities and thus no interest in the annuities' present value. Dkt. No. 66 at 20 (citing 29 U.S.C. § 1056(d)(1); I.R.S. Gen. Couns. Mem. 39882, 1992 WL 311700 (Oct. 26, 1992)). Again, the Court disagrees.

Defendants' argument assumes that the value of Plaintiffs' annuities is irrelevant unless they can realize that value via a sale (or another transaction). But the concept of "value" is not so narrow. *See NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 165–66 (2d Cir. 2012) (distinguishing "market price" from "value" and holding "it is not just plausible—but obvious—that [a financial instrument] would suffer a decline in value as a result of … less certain future cash flows"); *see also Value*, Black's Law Dictionary (12th ed. 2024) (defining value as, among other things, "[t]he significance, desirability, or utility of something" or "[t]he monetary *worth* … of something" (emphasis added)). In considering a similar claim, the court in *Piercy* likewise concluded, "there would be little question as to whether an annuity recipient is harmed if he or she received a riskier product than was purchased." *Piercy,* 2025 WL 2809008, at *1. Rejecting the same argument Defendants advance here, the court observed, "[w]hile a secondary market may provide a basis for measuring that harm, the lack thereof does not automatically foreclose its proof." *Id.*

Though arising in a different context, the Second Circuit's discussion of "value" in *NECA-IBEW Health & Welfare Fund* illustrates this point. *See* 693 F.3d at 165–67. In that case, a fund

ORDER GRANTING MOTIONS TO DISMISS - 16

that purchased mortgage-backed securities sued the issuer, alleging it was injured, for purposes of the Securities Act, by misrepresentations concerning the creditworthiness of the underlying mortgage borrowers. *Id.* at 166. According to the plaintiff, the value of the securities, which were assumed to be illiquid, declined since the initial offering due to revelations about the poor creditworthiness of the mortgage borrowers. *Id.* The district court dismissed the case, reasoning (as Defendants argue here) "that plaintiff suffered no loss because … no payments had been missed" and because any "hypothetical price" was irrelevant since the securities were illiquid. *Id.* The Second Circuit reversed, explaining that "basic securities valuation principles—discounting future cash flows to their present value using a rate of interest reflecting the cash flows' risk— belie the proposition that a fixed income investor must miss an interest payment before his securities can be said to have declined in 'value.'" *Id.* The Court went on to reject the notion that a security's "price" is equivalent to "its 'value.'" *Id.* at 167. Indeed, the Court explained, "valuing illiquid assets is an important (and routine) activity for asset managers[.]" *Id.* Similarly, this Court is unconvinced that the ability to sell or alienate an annuity is essential to showing injury based on a decline in the annuity's value.

Finally, another obvious benefit of a secure annuity is that it affords the retiree "a sense of security" and "peace of mind" that they "will be provided a set amount of money for the entirety of [their] life, no matter how long [they] live[] and despite external market factors." *Hoak v. Plan Adm'r of Plans of NCR Corp.*, 717 F. Supp. 3d 1280, 1301–02 (N.D. Ga. 2024) (finding that plan sponsor "adversely affected" beneficiaries by converting fixed annuities to a single lump sum payment), *aff'd sub nom. Hoak v. Ledford*, 153 F.4th 1148 (11th Cir. 2025). This, in turn, has implications for how frugally the retiree must live, their ability to plan for the future, and the timing

ORDER GRANTING MOTIONS TO DISMISS - 17

of their retirement.[4]  The value of this guarantee is, of course, "only as worthwhile as the company issuing it."  *Miyake v. Sec'y of Health & Hum. Servs.*, No. 06-459, 2009 WL 959563, at *3 (Fed. Cl. Mar. 19, 2009).

In summary, the Court concludes that Plaintiffs have adequately alleged an injury in fact based on the alleged diminution in the value of their annuities resulting from Defendants' selection of Athene.[5]  As alluded to above, the Court recognizes that other district courts have read *Thole* differently and reached disparate conclusions regarding standing in similar cases.  *See Konya v. Lockheed Martin Corp.*, 24-cv-00750, 2025 WL 962066, at *13 (D. Md. Mar. 28, 2025) (finding Article III standing where complaint alleged a "substantially increased risk" that annuity provider would fail), *appeal docketed*, No. 25-2061 (4th Cir. Sep. 9, 2025); *Piercy*, 2025 WL 2505660, at *11–13 (finding standing based on receipt of a less reliable, and thus less valuable, annuity than plaintiffs claimed they were entitled to); *Doherty v. Bristol-Myers Squibb Co.*, No. 24-CV-06628, 2025 WL 2774406, at *5–10 (S.D.N.Y. Sep. 29, 2025) (finding standing where complaint alleged a substantial risk of default and diminution in value of an annuity as compared to a pension); *but see Camire v. Alcoa USA Corp.*, 24-cv-01062, 2025 WL 947526, at *3–4 (D.D.C. Mar. 28, 2025) (rejecting standing theories based on diminution in value of benefits, failure to promote plaintiff's interests, and purported exception to injury-in-fact requirement for claims seeking equitable relief); *Bueno*, 2025 WL 2719995, at *10–19  (rejecting standing theories based on diminution in value of an annuity as compared to a pension, invasion of right to be free of fiduciary breaches,

---

[4] Similarly, Federal Reserve Board regulations permit lenders to consider the "probable continuance of" income from "an annuity … or other retirement benefit" in "evaluating an applicant's creditworthiness."  12 C.F.R. § 202.6(b)(5).  Lenders "must evaluate income derived from" such "retirement benefits … on an individual basis … and must assess" the "reliability or unreliability" of such income "by analyzing the applicant's actual circumstances."  12 C.F.R. pt. 1002, Supp. I, ¶ 6(b)(5).  Thus, a retiree who receives a less reliable (and therefore less valuable) annuity is injured because their annuity provider's creditworthiness potentially affects their own ability to get a loan, further undermining Defendants' theory that an annuity's value has no impact on an annuitant with no ability to sell.

[5] The Court therefore declines to reach Plaintiffs' alternative standing theories.

ORDER GRANTING MOTIONS TO DISMISS - 18

and substantial risk of future default); *Schoen v. ATI, Inc.*, No. 2:24-CV-01109, 2025 WL 2970339, at *5–7 (W.D. Pa. Oct. 7, 2025) (rejecting same theories after reviewing district court decisions and finding *Camire* and *Bueno* persuasive), *objections to R. & R. filed* (Oct. 21, 2025); *Dempsey v. Verizon Commc'ns, Inc.*, No. 24 CIV. 10004 (AKH), 2026 WL 72197, at *7–9 (S.D.N.Y. Jan. 8, 2026) (rejecting standing theories based on alleged risk of future default, purported exception to injury-in-fact requirement for claims seeking disgorgement, and diminution in value of plaintiffs' retirement plan).  With respect to those courts reaching a different result, this Court concludes that Plaintiffs have adequately alleged an injury in fact at this stage of the case.

2. Traceability to Weyerhaeuser

The Weyerhaeuser Defendants briefly argue that, even if the Amended Complaint alleges an injury-in-fact, any such injury is not traceable to them because SSGA was delegated sole fiduciary responsibility for selecting an annuity provider.  Dkt. No. 66 at 28.  To satisfy the traceability requirement a plaintiff need only show "a 'line of causation' between defendants' action and [the] alleged harm that is more than 'attenuated.'"  *Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011) (quoting *Allen v. Wright*, 468 U.S. 737, 757 (1984)).  In other words, "proximate cause" is unnecessary.  *Id.*  "Article III 'requires no more than *de facto* causality[.]'"  *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019) (citation omitted).

Plaintiffs allege that SSGA's selection of Athene resulted, in meaningful part, from the Weyerhaeuser Defendant's decision to hire SSGA to select an annuity provider, its failure to monitor SSGA's performance of its fiduciary duties, and its ultimate decision to proceed with a PRT transaction after SSGA selected Athene—a decision Plaintiffs allege Weyerhaeuser retained the discretion to make.  Dkt. No. 62 ¶¶ 130, 137, 188–190.  Such "[a] causation chain does not fail simply because it has several links, provided those links are not hypothetical or tenuous and remain plausible."  *Maya*, 658 F.3d at 1070 (citation modified).  Setting aside the merits of the ERISA

ORDER GRANTING MOTIONS TO DISMISS - 19

claims, Plaintiffs' allegations are sufficient to show that the Weyerhaeuser Defendants' conduct was a *de facto* cause of Plaintiffs' claimed injuries. *See Iten v. Los Angeles*, 81 F.4th 979, 985 (9th Cir. 2023) ("Although a merits question may look similar to the standing question of whether there is an injury in fact traceable to the relevant law under which the plaintiff has brought suit, confusing the two conflates standing with the merits." (citation modified)); *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1352 (11th Cir. 2005) ("Causation in the standing context is a question of fact unrelated to an action's propriety as a matter of law.").

Accordingly, Plaintiffs also satisfy the traceability requirement as to the Weyerhaeuser Defendants.

## B.      Failure to State a Claim

Having determined that Plaintiffs have adequately pleaded standing, the Court considers if they have plausibly stated a claim under ERISA.  In evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court examines the complaint to determine whether, assuming the facts alleged are true, the plaintiff has stated "a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  In analyzing the sufficiency of the allegations, the Court must "draw all reasonable inferences in favor of the plaintiff." *In re Tracht Gut, LLC*, 836 F.3d 1146, 1150 (9th Cir. 2016).  Applying these standards, the Court concludes that Plaintiffs have failed to state a claim against either Defendant.

### 1.   Breach of fiduciary duty (Counts I)

Count I of the Amended Complaint alleges that Defendants violated their twin duties of

ORDER GRANTING MOTIONS TO DISMISS - 20

prudence and loyalty under ERISA.  *See* 29 U.S.C. § 1104(a)(1)(A), (B).[6]  The Court considers the allegations relevant to each duty separately.

a.    <u>*Duty of prudence*</u>

ERISA's duty of prudence requires plan fiduciaries to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(B); *see also* 29 C.F.R. § 2550.404a-1(b)(1).  Plaintiffs allege that Defendants failed to undertake the "objective, thorough, and analytical search for an annuity provider" ERISA requires, as evidenced by their selection of Athene, which, according to Plaintiffs, provides a materially less safe annuity than other available providers.  Dkt. No. 62 ¶¶ 34, 141–142.

"ERISA 'requires prudence, not prescience.'"  *Anderson v. Intel Corp. Inv. Pol'y Comm.*, 137 F.4th 1015, 1021 (9th Cir. 2025) (quoting *Debruyne v. Equitable Life Assurance Soc'y of the U.S.*, 920 F.2d 457, 465 (7th Cir. 1990)), *cert. granted sub nom. Anderson v. Intel Corp. Inv.*, No. 25-498, 2026 WL 120679 (U.S. Jan. 16, 2026).  Accordingly, courts evaluate imprudence claims by focusing on the "fiduciary's actions based upon information available … at the time of each investment decision and not from the vantage point of hindsight."  *Id.* (quoting *PBGC ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 716 (2d Cir. 2013)).  Plaintiffs need not, however, plead "extensive information regarding the fiduciary's 'methods and actual knowledge' because those details 'tend to be in the sole possession of [the

---

[6] Many of Plaintiffs' allegations refer to "Defendants" collectively because, although the Weyerhaeuser Defendants appointed SSGA to independently select an annuity provider, Plaintiffs contend "the Weyerhaeuser Defendants maintained full responsibility … to monitor" SSGA "and to ensure" SSGA "was performing its delegated tasks" in compliance with ERISA.  Dkt. No. 62 ¶ 144.  Thus, Plaintiffs claim that any breach by SSGA essentially resulted in a breach by the Weyerhaeuser Defendants.  *Id.* ¶¶ 144, 172–76, 185–86, 187–90.  In discussing Plaintiffs' allegations, the Court refers to Defendants collectively or singularly depending on how the allegation refers to them.

ORDER GRANTING MOTIONS TO DISMISS - 21

fiduciary].'" *Id.* at 1025 (quoting *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822 (8th Cir. 2018)); *see also Concha v. London*, 62 F.3d 1493, 1503 (9th Cir. 1995) (explaining that "the circumstances surrounding alleged breaches of fiduciary duty" will "frequently be in the exclusive possession of the breaching fiduciary" and thus "defy particularized identification at the pleading stage"). Rather, "circumstantial factual allegations" may be sufficient if the allegations permit a court to "reasonably infer … that the process was flawed." *Id.* at 1022 (internal quotation marks omitted) (quoting *St. Vincent*, 712 F.3d at 718).

Defendants contend that Plaintiffs' allegations concerning Athene's risk factors relative to other insurers cannot support a duty of prudence claim because they largely postdate the 2019 Weyerhaeuser PRT transaction. Because courts "evaluate prudence prospectively, based on the methods the fiduciaries employed, rather than retrospectively, based on the results they achieved, it is not enough for a plaintiff simply to allege that the fiduciaries could have obtained better results"—such as "lower risks"—"by choosing different investments." *Id.* at 1021. The Court agrees that Plaintiffs fail to allege facts plausibly suggesting a duty of prudence violation.

Most of the Amended Complaint's specific factual allegations concerning Athene's risk factors postdate January 2019. These include Athene's surplus to liability ratio (in 2023), the growth rate of Athene's liabilities (from 2019 to 2023), Athene's reliance on affiliated Bermuda-based reinsurance (in 2020 through 2023), Athene's exposure to risky assets relative to its surplus (as of 2022), Athene's merger with Apollo (in 2022), the default rates of private equity-owned companies (from 2022 through 2024), and a penalty paid by Athene to New York regulators (in 2020)—to name just a few. *See* Dkt. 62 ¶¶ 62–66, 68–76, 86–90, 92–93, 96, 112–120, 122–24, 126. Because courts judge an ERISA fiduciary's actions based on "the circumstances then prevailing" at the time of the alleged breach, these allegations do not support Plaintiffs' duty of prudence claim. 29 U.S.C. § 1104(a)(1)(B).

ORDER GRANTING MOTIONS TO DISMISS - 22

Plaintiffs apparently concede that the post-2019 allegations cannot support their imprudence claim, arguing instead that the "allegations regarding Athene's current financial condition" go to Article III standing. Dkt. No. 74 at 53. As for the imprudence claim, Plaintiffs point to only two pre-2019 allegations that they claim demonstrate Athene's riskiness. First, they underscore that, by 2016, Athene had "transition[ed] out of the life insurance business[,]" which Plaintiffs allege makes Athene a riskier choice because the "[p]rovision of life insurance … is considered a natural hedge to [a provider's] annuities business." Dkt. No. 62 ¶ 100. Second, Plaintiffs allege that, at the time Defendants selected Athene, the Weyerhaeuser transaction "represented approximately 25% of Athene's pension group annuity sales" for the year. *Id.* ¶ 148. Plaintiffs contend that this demonstrates Athene "had little pension annuitization business[,]" making it a riskier choice of annuity provider. Dkt. No. 74 at 53.

Without more, these two allegations do not support a duty of prudence claim. To begin, Plaintiffs do not allege that operating a life insurance business is the *only* way to safely operate an annuity business. The mere fact that Athene exited the life insurance business by 2016 does not suggest that Defendants employed a flawed selection process or that Athene was a relatively risky choice. Nor does the fact that the Weyerhaeuser transaction accounted for 25% of Athene's group annuity sales in 2019. As Defendants point out, taking on relatively few other liabilities that year just as plausibly suggests Athene was in a *stronger* position to accommodate its new obligations to Weyerhaeuser retirees. Plaintiffs' pre-2019 allegations are simply too meagre to provide the requisite "'factual enhancement' to take the[ir] claim across 'the line between possibility and plausibility.'" *Anderson*, 137 F.4th at 1021 (quoting *Twombly*, 550 U.S. at 557). Accordingly, the Court will dismiss Plaintiffs' duty of prudence claim.

       b.     *Duty of loyalty*

ERISA's duty of loyalty requires fiduciaries to discharge their duties "solely in the interest

ORDER GRANTING MOTIONS TO DISMISS - 23

of the participants and beneficiaries" and "for the exclusive purpose of providing benefits to participants and their beneficiaries" and "defraying reasonable expenses of administering the plan[.]" 29 U.S.C. § 1104(a)(1)(A). The duty prohibits fiduciaries from "engaging in transactions that involve self-dealing or that otherwise involve or create a conflict between the trustee's fiduciary duties and personal interests." *Terraza v. Safeway, Inc.*, 241 F. Supp. 3d 1057, 1069 (N.D. Cal. 2017) (quoting Restatement (Third) of Trusts § 78 (2007)).

"To state a claim of disloyalty, a plaintiff must allege plausible facts supporting an inference that the defendant acted for the purpose of providing benefits to itself or someone else." *In re Allianz Glob. Invs. U.S. LLC Alpha Series Litig.*, 2021 WL 4481215, at *24 (S.D.N.Y. Sep. 30, 2021) (internal quotation marks and citation omitted). ERISA does not, however "prohibit 'the mere act of becoming a trustee with conflicting interests.'" *Anderson*, 137 F.4th at 1026 (quoting *Friend v. Sanwa Bank Cal.*, 35 F.3d 466, 469 (9th Cir. 1994)). Thus, the Ninth Circuit has held that "the potential for a conflict, without more, is not synonymous with a plausible claim of fiduciary disloyalty." *Id.* at 1026 (quoting *Kopp v. Klein*, 894 F.3d 214, 222 (5th Cir. 2018)). Allegations supporting a duty of prudence violation may also support a plausible inference of disloyalty. *See Johnson v. Providence Health & Servs.*, No. C17-1779-JCC, 2018 WL 1427421, at *8 (W.D. Wash. Mar. 22, 2018); *see also Wildman v. Am. Century Servs., LLC*, 237 F. Supp. 3d 902, 915 (W.D. Mo. 2017) (holding that factual allegations supporting imprudence claim also supported disloyalty claim).

Beyond their allegations of imprudence—which, as just discussed, are insufficient—Plaintiffs seek to bolster their disloyalty claim with allegations that SSGA was subject to several conflicting interests. For example, Plaintiffs allege SSGA, through its parent company, "held a substantial ownership interest in Weyerhaeuser's publicly traded securities" and "in Apollo, Athene's parent company." Dkt. No. 62 ¶¶ 125–126. According to Plaintiffs, SSGA was therefore

ORDER GRANTING MOTIONS TO DISMISS - 24

incentivized to select an annuity provider that would save Weyerhaeuser money and to select Athene in particular, thereby increasing Apollo's share price. Plaintiffs also allege that, as "a repeat player hired by employers" (Dkt. No. 74 at 59), SSGA "understood that its client's motivation in offloading pension obligations was to enhance corporate profits by reducing pension liabilities." Dkt. No. 62 ¶ 149. Accordingly, Plaintiffs contend SSGA had an incentive to select "the lowest-cost candidate without regard to safety" to "advance its client's interests" (*id.*) and bolster its reputation as an "'independent fiduciary' who would recommend cheap annuities." Dkt. No. 74 at 60.

Plaintiffs' allegations against SSGA do not plausibly suggest disloyalty. To begin, as with Plaintiffs' imprudence allegations, some of the purported conflicts Plaintiffs identify arose after the Weyerhaeuser PRT transaction. For instance, Plaintiffs allege that "[p]rior to the PRT transaction … State Street held no publicly traded shares in Apollo" and that Athene did not become a subsidiary of Apollo until years later. Dkt. No. 62 ¶¶ 62, 67, 126. Accordingly, SSGA's alleged acquisition of Apollo shares after the PRT transaction does not support a plausible inference that SSGA acted disloyally in selecting Athene in 2019.

As for the ownership of Weyerhaeuser stock by SSGA's parent company, Plaintiffs allege, at most, a "potential for conflict"—and a tenuous potential at that. *Anderson*, 137 F.4th at 1026. As another district court recently explained in another similar PRT lawsuit, "State Street holds stock in many companies tracking the major stock indexes on behalf of its clients. These investments are only incidentally for State Street's benefit, as its clients receive the benefit of these investments." *Dempsey*, 2026 WL 72197, at *12. Plaintiffs seem to concede (and do not allege otherwise) that SSGA held Weyerhaeuser stock on its clients'—rather than its own—behalf. *See* Dkt. No. 74 at 60 (acknowledging that "State Street holds … Weyerhaeuser stock on behalf of others" but arguing State Street still gains something "when that stock rises"). The mere fact that

ORDER GRANTING MOTIONS TO DISMISS - 25

SSGA might incidentally benefit from the appreciation of one stock held on behalf of its clients is not enough to raise an inference of disloyalty. *See Dempsey*, 2026 WL 72197, at \*12 ("This type of 'common business relationship' does not support a plausible inference of liability absent other allegations to support disloyalty." (citing *Patterson v. Morgan Stanley*, No. 16-CV-6568 (RJS), 2019 WL 4934834, at \*14 (S.D.N.Y. Oct. 7, 2019)); *see also Piercy*, 2025 WL 2505660, at \*25 ("Mere ownership of shares is insufficient to establish a conflict; still less so when the allegations do not specify the nature of the ownership and how such ownership would give rise to an inference that SSGA's motive was to further its own interests.").

That leaves the allegation that SSGA was a "repeat player" motivated to "advance its client's interests" by (according to Plaintiffs) selecting a cheaper annuity. Dkt. No. 74 at 59–60. But simply serving as a hired independent fiduciary in a PRT transaction does not suggest a duty of loyalty violation. *See Bussian*, 223 F.3d at 295 ("Because an employer may, consistent with ERISA's provisions, receive a plan's surplus upon termination, the fact that the employer terminates a plan specifically to gain access to that surplus is not a violation."); *Dempsey*, 2026 WL 72197, at \*12 ("Merely alleging that Defendants 'were driven by their desire to drive revenues and profits' is insufficient to state a claim for breach of the duty of loyalty." (citation omitted)). Indeed, courts have held that, "[i]n some instances," hiring "an independent fiduciary" may be the *only* course of action an employer may take consistent with its fiduciary duties. *Bussian*, 223 F.3d at 299. In sum, Plaintiffs' allegations against SSGA are not enough, on their own, to suggest that SSGA acted disloyally in selecting Athene.

Because Plaintiffs fail to adequately plead a breach of fiduciary duty, the Court will dismiss Count I of the Amended Complaint, including Plaintiffs' claim of co-fiduciary liability, which depends upon the existence of an underlying breach by one of the Defendants. *See* 29 U.S.C. § 1105(a).

2.  Prohibited transactions (Count III)

Count III of the Amended Complaint alleges that Defendants separately violated ERISA by engaging in expressly prohibited transactions. ERISA "supplements the fiduciary's general duty of loyalty to the plan's beneficiaries ... by categorically barring certain transactions deemed 'likely to injure the pension plan.'" *Cunningham v. Cornell Univ.*, 604 U.S. 693, 697 (2025) (quoting *Harris Tr. and Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 241–42 (2000)). Plaintiffs contend the Athene transaction violates ERISA's categorical prohibition on transferring plan assets to "a party in interest" (29 U.S.C. § 1106(a)(1)(D)) and, separately, its prohibition on self-dealing by fiduciaries using plan assets (*id.* § 1106(b)(1)–(2)).

a.    *Transaction with a "party in interest"*

Plaintiffs' first theory is premised on the notion that Athene was a "party in interest" because it provided services to the Weyerhaeuser plan. Dkt. No. 62 ¶ 181; *see* 29 U.S.C. § 1002(14)(B) (defining "party in interest" to include "a person providing services to [the] plan"). The only service Athene allegedly provided, however, was the sale of the group annuity contracts at issue in the 2019 PRT transaction itself. "For a party to be a party in interest 'some prior relationship must exist between the fiduciary and the service provider.'" *Dempsey*, 2026 WL 72197, at *12 (quoting *Ramos v. Banner Health*, 1 F.4th 769, 787 (10th Cir. 2021)); *see also D.L. Markham DDS, MSD, Inc. 401(K) Plan v. Variable Annuity Life Ins. Co.*, 88 F.4th 602, 610 (5th Cir. 2023) (holding that "entities that are not already providing services to a particular plan at the time of contracting with that plan … are not 'parties in interest' under ERISA"). Plaintiffs' circular argument that the PRT transaction itself made Athene a "party in interest," thus rendering the PRT a prohibited transaction, would lead to the absurd result of prohibiting *all* PRTs involving an annuity provider even though ERISA expressly authorizes them elsewhere. *See* 29 U.S.C. § 1341(b)(3)(A); *see also Patrico v. Voya Fin., Inc.*, 16 CIV 7070 (LGS), 2018 WL 1319028, at *7

ORDER GRANTING MOTIONS TO DISMISS - 27

(S.D.N.Y. Mar. 13, 2018) ("It is circular to suggest that an entity which becomes a party in interest by providing services to the Plan has engaged in a prohibited transaction simply because the Plan has paid for those services.").

Accordingly, the Court will dismiss Plaintiffs' prohibited transaction claim insofar as it is premised on a "party in interest" theory.

b.    *Transaction involving self interest*

Next, Plaintiffs claim that Defendants engaged in prohibited self-dealing by managing plan assets "in [their] own interest" and on their "own account" and engaging in a transaction "adverse to the interests of the plan or the interests of its participants or beneficiaries."  29 U.S.C. § 1106(b)(1)–(2).  Plaintiffs invoke section 406(b) of ERISA, which categorically prohibits "certain transactions that on their face are 'tainted by a conflict of interest and thus highly susceptible to self-dealing.'"  *Piercy*, 2025 WL 2505660, at *48 (quoting *Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1213 (2d Cir. 1987)).  In other words, "the transaction, itself, should communicate the breach."  *Kayes v. Pac. Lumber Co.*, 51 F.3d 1449, 1466 (9th Cir. 1995) (quoting *Waller v. Blue Cross of Cal.*, 32 F.3d 1337, 1346 (9th Cir. 1994)).  Plaintiffs claim that Defendants engaged in a prohibited transaction by purchasing Athene annuities "so as to increase Weyerhaeuser's corporate profits," rather than selecting "the safest available annuity" in the interests of plan participants. Dkt. No. 62 ¶ 183.

The Ninth Circuit has squarely rejected section 406(b) liability based on the theory Plaintiffs advance.  In both *Waller* and *Kayes*, the Ninth Circuit held that, absent a prohibited party-in-interest transaction, "purchasing annuities to terminate" a pension plan does not "constitute[] a per se violation of ERISA, even if accomplished through an infirm bidding process or for improper purposes" such as "maxim[izing] the amount of [the employer's] reversion[.]"  *Waller*, 32 F.3d at 1345–46; *see also Kayes*, 51 F.3d at 1466 (rejecting argument that section 406(b) prohibited

ORDER GRANTING MOTIONS TO DISMISS - 28

selection of Executive Life as annuity provider "in order to maximize [the employer's] recovery of surplus plan assets"). Plaintiffs' allegation that Defendants selected Athene to maximize Weyerhaeuser's profits is thus insufficient to state a section 406(b) prohibited transaction claim.

Accordingly, the Court will dismiss Count III of the Amended Complaint.

3. Knowing participation and failure to monitor liability (Counts II & IV)

Because Plaintiffs fail to plead a direct violation of ERISA, the Court will dismiss Plaintiffs' claims for knowing participation and failure to monitor, which are derivative of an underlying ERISA violation. *See Piercy*, 2025 WL 2505660, at *20 (explaining that for "derivative claims" such as "knowing participation" or "failure to monitor," "there must first be a valid claim for breach of fiduciary duty").

**C.    The Court Will Grant Leave to Amend**

"[A] district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (quoting *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995)). Here, Plaintiffs have had one opportunity to amend their claims already. But the Court finds that Plaintiffs could still "possibly" cure the deficiencies in their Amended Complaint with additional factual allegations and thus grants leave to amend.

### III.    CONCLUSION

The Court GRANTS the motions to dismiss (Dkt. Nos. 66, 67) and DISMISSES Plaintiffs' claims without prejudice. Plaintiffs may file a second amended complaint by April 30, 2026.

Dated this 31 day of March, 2026.

Kymberly K. Evanson
United States District Judge

ORDER GRANTING MOTIONS TO DISMISS - 29